# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

April 27, 2009

No. 07-40699

Charles R. Fulbruge III
Clerk

DENISE ANN DAY

                                        Petitioner-Appellant

v.

NATHANIEL QUARTERMAN, DIRECTOR, TEXAS DEPARTMENT
OF CRIMINAL JUSTICE, CORRECTIONAL INSTITUTIONS
DIVISION

                                        Respondent-Appellee

---

Appeal from the United States District Court
for the Eastern District of Texas

---

Before SMITH, SOUTHWICK, Circuit Judges and RODRIGUEZ[1], District
Judge.

RODRIGUEZ, District Judge.

Denise Ann Day, the Petitioner-Appellant, appeals a district court order
that dismissed her habeas corpus application filed pursuant to 28 U.S.C. § 2254.
Day was convicted in Texas state court on three counts of injury to a child in
violation of Texas Penal Code § 22.04(a)(1). Following an unsuccessful appeal
of the convictions and the denial of a state court habeas petition, Day filed her
federal writ petition, arguing in part that her trial counsel rendered ineffective

---

[1] District Judge of the Western District of Texas, sitting by designation.

assistance by failing to examine adequately the prosecution's medical evidence prior to trial, failing to cross-examine adequately the State's medical experts, and failing to obtain a defense medical expert to challenge the State's medical expert testimony. The district court dismissed the petition. Day contends on appeal that the district court's ruling with respect to her ineffective assistance claim was erroneous because the district court failed to consider properly this Court's holding in *Draughon v. Dretke*, 427 F.3d 286 (5th Cir. 2005). Finding no reversible error, we affirm.

## I.

### A.     The Trial Proceedings[2]

On January 22, 1999, Day was convicted in Texas state court on three counts of injury to a child in violation of Texas Penal Code § 22.04(a)(1). The evidence presented at trial showed that during the relevant time-frame, Day provided daycare for children, including the victims, Nathan Taylor and Emma Russell. Tina Taylor, Nathan's mother, testified that Nathan was born in January 1997 and that she left Nathan in Day's daycare periodically between April 7, 1997 and May 22, 1997. Between May 14 and May 22, Mrs. Taylor observed that Nathan was displaying "fussy" behavior, that Nathan could not put weight on his right leg, and eventually, that Nathan would scream and cry whenever he was moved. After multiple visits to a pediatrician and a visit to a pediatric orthopedic surgeon, the surgeon determined that Nathan's leg was fractured and immediately performed surgery to repair the fracture. Nathan spent three weeks in a full body cast. Nathan's mother, father, and half-sister

---

[2] The account of the trial proceedings provided herein was copied, with limited revision, from the account of the trial proceedings provided in the state intermediate appellate court's opinion denying Day's direct appeal. *See Day v. State*, Nos. 05-99-00368-CR, 05-99-00369-CR, 05-99-00370-CR, 2001 WL 1674224, at *1-6 (Tex. App.—Dallas, Jan. 4, 2002, pet. ref'd).

each testified that nothing had happened to Nathan in their presence that would account for the fracture.

Mrs. Taylor called Day to find out what had caused the break. Day did not offer an explanation at first but later told Mrs. Taylor that a toddler whom she called "Big Nathan" had fallen on Nathan's leg. At the request of the police, Mrs. Taylor allowed them to record a subsequent phone call she made to Day. In the call, Day again said that Big Nathan had fallen on Nathan.

Kris Russell, Emma's mother, testified that Day cared for her two children, Fes and Emma. Emma was born on February 19, 1997, and Day began looking after Emma in April of 1997. After seeing Emma vomit repeatedly during May and June of 1997, Mrs. Russell decided to take Emma to a doctor. Dr. Mosier examined Emma, discovered that Emma had an "enlarged head," concluded Emma had gastrointestinitis, and sent Emma home. Day continued to care for Emma, yet Emma's condition continued to decline, so Mrs. Russell took Emma to a hospital emergency room and subsequently to a pediatrician. Although Emma was tested for meningitis, those who examined Emma concluded that Emma was merely suffering from a virus.

Mrs. Russell again left Emma and Fes in Day's care on Monday, June 23. While at work, Mrs. Russell received a message from Day telling her that Emma was being "fussy" and that Fes had pushed Emma out of a swing and possibly injured Emma's leg. Mrs. Russell would later notice that Emma would not "stand" on her lap and that Emma's legs "looked a little bit bent." Emma's parents took Emma back to the emergency room, where a doctor discovered Emma had two broken femurs. Emma was placed in traction to straighten her femurs. Over the next week, Emma underwent a number of tests, received two bilateral subdural taps to relieve the swelling in her head, and had a subdural shunt surgically implanted in her head to drain fluid. After Emma was removed from traction, she was placed in a body cast for two weeks. The shunt was

removed eight months later. Emma's mother and father each testified that neither knew of anything that occurred in their presence that could have caused Emma's injuries.

On June 24, at the request of police, Mrs. Russell called Day twice. The phone conversations were recorded. In the first conversation, Day stated she saw Fes push a swing seat, causing Emma to fall from the seat onto her own legs.

Marie Brown testified she was a case manager for the Texas Department of Protective and Regulatory Services, Child Protective Services Division. She investigated Day and the allegation that Day caused Nathan's injuries. Day gave Brown different stories on different occasions, telling her Nathan's injuries were caused when a child bumped him out of a swing and onto the floor, when Big Nathan fell on him, or when he was in a walker.

Richie Rhyans, a child-care investigator for the Child Care Licensing Division of the Texas Department of Protective and Regulatory Services also investigated Nathan's injuries. She testified that Day told her that another child had fallen on Nathan's leg, causing the injury. While working on Nathan's case, Rhyans learned of Emma's injuries and began to investigate Emma's case as well. Day told Rhyans that Mrs. Russell had warned Day that Fes would pick on Emma. Day told Rhyans that on some unspecified date, Day was preparing to change Emma's diaper when Fes "jerked" Emma out of a swing and caused Emma to fall awkwardly on her legs.

Detective Michael Johnson testified that he arranged the taping of the parents' phone calls to Day and obtained two written statements from Day. Johnson also tape recorded an interview he had with Day, admitted and played for the jury, in which Day blamed Fes for Emma's injuries, contending Fes pushed Emma from a swing. She also blamed Big Nathan's fall for Nathan's

injuries. Day also implied Mrs. Russell may have been responsible for Emma's injuries.

The prosecution presented the testimony of five doctors, each qualified as experts. Doctor Joel Leffler, a pediatric opthamologist, testified that he examined Emma on June 26, 1997 and found hemorrhages throughout both of her retinas and that her optic nerves were swollen due to cranial pressure. Leffler testified that retinal hemorrhaging was "quite common with shaken baby syndrome" and that Emma's hemorrhages were not very old. He also testified that retinal hemorrhaging in infants had several causes, but Emma did not display evidence of any cause other than shaken baby syndrome. Emma's hemorrhages did not clear up until November 1998.

Doctor David Klamer, a musculoskeletal radiologist who examined x-rays of Emma's legs and pelvis taken on June 23 and 24, 1997, testified that each of Emma's femurs had an acute spiral fracture. Klamer stated that a spiral fracture is caused by a twisting force, and would not be caused by a "direct fall." He described an acute fracture as a relatively recent fracture that does not show signs of healing. Klamer testified that multiple fractures of the type Emma suffered are considered indicative of child abuse.

Klamer also examined CAT scans of Emma's skull taken on June 25, 1997. Klamer testified that one scan showed a very large subdural hemorrhage that appeared to have been present several weeks to months before the scan was taken. According to Klamer, Emma's hemorrhage was indicative of "battered-child syndrome." Klamer also testified another scan taken on the 25th showed Emma had a fracture on the left side of her skull. Klamer stated that "a considerable amount of force" was required to cause the kind of skull fracture Emma suffered. Klamer said subsequent CAT scans showed Emma's subdural hemorrhage slowly getting smaller.

Dr. Christine Quatro, a pediatric orthopedic surgeon, testified that she took x-rays of Nathan's leg on May 23, 1997 and discovered a "short spiral fracture" in Nathan's right femur. Quatro testified that the break appeared to be healing, which indicated to Quatro that the fracture occurred seven to ten days before the x-ray was taken. Quatro opined that Nathan's fracture was caused by someone turning Nathan's right foot or ankle towards his left foot while holding his body still. She testified that a four-month-old baby, the age Nathan was at the time of his injury, would not be able to cause a femoral spiral fracture on his own, nor could the fracture be caused by "bouncing" in a walker.

Quatro testified that a four-month-old child has bones that are "very plastic," meaning they have some "give" and, as a result, require considerable force to actually break. She testified that spiral fractures of the femur are rare for children less than a year old because they are not yet walking on their own and do not have sufficient body weight to generate the force needed to cause a spiral fracture. When a child's femur breaks, the child will "immediately scream and cry," and there may be a snapping or a popping noise.

Quatro conceded that a thirty-five-pound child[3] falling onto a four-month-old child could cause a spiral fracture of the femur, but thought that such an occurrence was unlikely. Quatro believed that such an incident would probably cause a transverse fracture, or a "clean break," rather than a spiral fracture. Quatro also examined x-rays taken of Nathan on May 15, one of which showed a fracture in his right leg. However, that fracture was not displaced, and the fracture shown in the May 23 x-ray was a displaced fracture. Quatro testified that a child falling on an already-broken leg could cause the fracture to displace. Moving a leg to change a diaper could also cause the displacement.

---

[3] The record suggests "Big Nathan" weighed approximately thirty-five pounds.

Quatro testified that skull fractures and bilateral fractures[4] are highly indicative of child abuse. At trial, Quatro compared Nathan's x-rays and Emma's x-rays and declared the leg fractures were "[v]ery similar." Quatro testified that the fractures shown in Emma's x-rays could not have been caused by a child's fall from a swing similar to the swing from which Day said Emma fell. Quatro concluded that the children's injuries were not caused by accident, but were inflicted intentionally and knowingly.

Doctor David Owen, a pediatric neurologist, testified that he examined Emma on June 25, 1997 and concluded that Emma was suffering from, among other things, a subdural hemorrhage, "probably due to being shaken," and a skull fracture. Owen testified that shaking a child can cause small blood vessels in the brain to "break and ooze blood" and that children are particularly susceptible to injury from shaking. Subdural hemorrhages might cause brain damage, cerebral palsy, mental retardation, seizures, and death. Owen stated the skull fracture could have been caused by striking an object instead of shaking. Owen also believed Emma's injuries were two-to-four weeks old at the time he examined her. The pressure from the subdural hemorrhage caused the plates of Emma's skull to grow abnormally, so she wore a "DC band" to correct the shape of her skull. Owen testified Emma's injuries were consistent with shaken baby syndrome, that they were not the result of an accident, and that he had no explanation other than child abuse. Owen testified that a toddler would not be able to inflict the injuries Emma suffered.

Doctor Frank McGehee testified that shaken baby syndrome occurs when a baby's body is shaken back and forth, causing "a whiplash injury" to the head. Symptoms of the syndrome include cranial bleeding and hemorrhages in the back of the eye or retina. One of the effects of the syndrome is brain damage.

---

[4] Bilateral fractures are those that occur on both sides of the body, such as when both arms are broken.

He examined Emma's medical records and concluded she had been intentionally injured and had been shaken, most likely on June 11, 1997.

McGehee testified that pressure on a baby's brain will cause the baby to vomit. McGehee also testified that a toddler does not have the strength to shake a baby hard enough to cause the injuries associated with shaken baby syndrome. He further testified that a baby is not capable of causing spiral fractures of its own femurs, and the force required to cause those kinds of fractures is equivalent to being hit by a car going twenty miles-per-hour. McGehee stated that a fall from a swing onto carpet would not have caused Emma's skull fracture and that Nathan's spiral fracture could not have happened from anything he did in a walker or by a toddler falling on his leg.

The testimony of the State's five medical experts thus tended to show that the victims' injuries were caused by intentional conduct and that the injuries occurred during the time frame in which the victims may have been under Day's care. Day's counsel declined to cross-examine Dr. Leffler and Dr. Owen. Day's counsel cross-examined Dr. Quatro extensively regarding alternative causes of Nathan's injuries and elicited testimony that called into question the date of Nathan's initial injury. Day's attorneys elicited testimony from Dr. Kramer that he was presuming abuse until shown evidence to the contrary, but they did not challenge his medical conclusions. Similarly, Day's counsel did not challenge Dr. McGehee's medical conclusions but elicited testimony from him that he was only testifying that Emma's injuries were intentionally inflicted, not that Day specifically injured Emma.

In defense of Day, Day's husband testified as to Day's character as a "good mom" and "a competent day care provider." He testified her "ultimate" concern was the welfare of the children she cared for. Day's husband never saw Day hurt or try to hurt any child under her care.

Day also testified, denying that she harmed Nathan or Emma or knowing how they got hurt. She testified that she noticed "something was seriously wrong" with Emma when Mrs. Russell dropped off Emma on June 23. She discussed Emma's condition with Mrs. Russell, who assured Day that Emma had been diagnosed with meningitis. Day testified that on that day she was preparing to change Emma's outfit while Emma was in a swing and Fes "was standing right around the swing area." Day turned her back to gather the items she needed to change Emma, and when she turned back around, Emma was "lying on the floor." Fes had his hand on the swing and had apparently pulled it back, causing Emma's fall. Emma's legs were bent underneath her, but she did not fuss or cry.

## B.     The State Habeas Corpus Proceeding

After an unsuccessful direct appeal, Day filed a state habeas petition in which she alleged that her trial counsel rendered ineffective assistance during the guilt/innocence phase by failing to review much of the State's medical evidence prior to trial, failing to cross-examine some of the State's medical experts, and failing to secure the assistance of a medical expert for the defense.[5]

In support of her petition, Day pointed to comments made by her lead attorney before trial that he had not reviewed all available records. Approximately one month prior to trial, the State filed medical records it intended to rely upon in prosecuting Day. One week before trial, the district court clerk delivered copies of the medical records to Day's counsel. On the same day, Day's lead attorney filed a hand-written motion to continue, explaining that he would need more time to review the voluminous records, to investigate the

---

[5] Day also alleged that her counsel was ineffective for failing to strike a juror who said he could not consider a probated sentence and that the State failed to disclose exculpatory evidence. She did not raise these issues in her COA motion or in her appellate brief and therefore has waived them. *See Hughes v. Johnson*, 191 F.3d 607, 613 (5th Cir. 1999).

State's medical evidence, and to secure a medical expert. Day's counsel did not explain why he did not take the opportunity to review the records in the clerk's office before the clerk delivered copies of the records to him. The State's attorney responded that she had made the records available in her office for the preceding six months but that Day's counsel never sought the records directly from her. The trial court denied the continuance. On the first day of trial, Day's counsel stated that he still had not reviewed many of the medical records received from the State the previous week.

The district court that initially reviewed Day's petition ordered Day's trial counsel to file affidavits addressing whether, and to what extent, they reviewed and prepared for the State's medical evidence. Day's lead trial attorney passed away shortly after Day's trial and before the state habeas proceedings. Co-counsel representing Day at trial submitted an affidavit in which he testified that Day's trial counsel read the medical records prior to trial but sought the continuance to try "to slow the train down." He did not explain why they failed to secure a medical expert to assist in Day's defense.

Day submitted to the state habeas court the affidavit of Dr. John Galaznik. Galaznik, a certified pediatrician, testified in the affidavit that he reviewed the State's testifying medical experts' testimony and the X-ray and CT scan reports but did not review the actual studies or photographs of the patients. Galaznik concluded that: (1) clear evidence existed within the medical record that Emma's head injury and central nervous system ("CNS") pathology occurred before Emma was placed in Day's care; (2) Dr. Owen, who testified that Emma's CNS pathology was two-to-four weeks old when he diagnosed it, was aware of evidence that the pathology was present more than seven weeks before it was diagnosed; (3) Dr. McGehee, who testified that Emma was "fine" until June 11, 1997 when she suffered injuries that exhibited shaken baby syndrome, failed to take note of evidence that proved that Emma's CNS symptoms were well

established by May 5, 1997; (4) Emma's head injury was caused either by her parents' abuse or perinatal trauma; (5) many contradictions existed within the State's evidence that cast doubt as to the validity of the State's shaken baby hypothesis and Dr. McGehee's theory regarding the cause of Emma's head injury; and (6) clear medical disagreement existed that would cast doubt upon the State's theory that Nathan's and Emma's femoral fractures were not caused by accidental forces.

The state district court made findings of fact and conclusions of law, including: the facts stated in trial counsel's affidavit were true; trial counsel reviewed the medical records and were prepared for the State's medical evidence at trial; the failure to contest "the majority" of the medical conclusions of the State's experts was the result of reasonable trial strategy by Day's counsel; it was reasonable not to call a defense expert to contest the State's medical evidence in light of the defense strategy that identity of the perpetrator was the primary issue and the jurors would likely find the State's doctor's testimony credible; trial counsel provided representation within the standards of reasonableness established by professional norms; and the result of the proceeding would not have differed even if trial counsel adopted a different cross-examination strategy of the State's medical experts. The Texas Court of Criminal Appeals adopted the findings and conclusions and denied relief without opinion.

## C.    The Federal District Court Habeas Corpus Proceeding

Day subsequently filed a federal writ petition asserting the same grounds for relief as sought in her state application and again submitting Galaznik's affidavit. The federal district court referred Day's petition to a magistrate judge for findings of fact, conclusions of law, and recommendations for the disposition of the case. The Magistrate Judge recommended that the ineffective assistance claim be dismissed because:

11

[Day's] contention that an expert would have provided favorable testimony was speculative and insufficient to demonstrate that there was a reasonable probability that the result would have been different if an expert had been hired to testify at trial. Furthermore, Dr. Galaznik did not state that he was available and willing to testify at [Day's] trial. *See id.* [citing *Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985)]. As a result, [Day] has not shown she suffered prejudice because counsel did not call a medical expert to testify. Additionally, [Day] has failed to demonstrate a reasonable probability that the result of the trial would have been different, but for counsel's unprofessional error in not reading all of the medical records and in failing to cross examine the State's experts. She has not show[n] that counsel's performance was deficient or that she was prejudiced.

Day objected to the Magistrate Judge's report and recommendation, contending that her case was "materially indistinguishable" from the facts presented in *Draughon v. Dretke*, 427 F.3d 286 (5th Cir. 2005), a capital habeas appeal in which a panel of this Court affirmed a district court's determination that a state court unreasonably applied *Strickland v. Washington*, 466 U.S. 668 (1984), to a claim of ineffective assistance of counsel. The district court declined to consider *Draughon*, stating merely that "the standards for death penalty cases are not applicable to this non-death penalty case." The district court then adopted the Magistrate Judge's recommendations and dismissed the petition.

## II.

In a federal habeas corpus appeal, the district court's findings of fact are reviewed for clear error and the district court's conclusions of law are reviewed *de novo*. *Gomez v. Quarterman*, 529 F.3d 322, 327 (5th Cir.), *cert. denied*, 129 S. Ct. 628 (2008). When a federal habeas petitioner's claim has been adjudicated on the merits in a state court proceeding, a federal court may only grant habeas relief if the state court's adjudication of the claim either (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the United States Supreme Court, or

(2) resulted in a decision that was based on an unreasonable interpretation of the facts in light of evidence presented in the state court proceeding. 28 U.S.C. § 2254(d); *Gomez*, 529 F.3d at 327. A state court's decision is contrary to clearly established Supreme Court precedent if it applies a rule that contradicts the governing law set forth in Supreme Court precedent or if it confronts a set of facts that are materially indistinguishable from a Supreme Court decision and arrives at a different result. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). A state court unreasonably applies clearly established federal law if it identifies the correct governing principle but unreasonably applies that principle to the facts of the case. *Brown v. Payton*, 544 U.S. 133, 141 (2005). The question is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable – a substantially higher threshold. *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). Further, the federal habeas court must defer to the state court's factual findings unless the petitioner rebuts those findings with clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

Because Day presents claims of ineffective assistance of counsel, the district court's task was to analyze the state court habeas decision in light of *Strickland v. Washington*, 466 U.S. 668 (1984). *Strickland* established a two-prong test for deciding ineffective assistance claims, under which the petitioner must show that trial counsel's performance was deficient and that the deficient performance prejudiced the defendant. *Id.* at 687. Counsel's performance is deficient where it falls short of reasonable performance under prevailing professional norms. *Id.* at 688. The standard requires the reviewing court to give great deference to counsel's performance, strongly presuming counsel exercised reasonable professional judgment. *Id.* at 690. In order to prove prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 695. The petitioner must "affirmatively prove," not just

allege, prejudice. *Id.* at 693. If the petitioner fails to prove the prejudice component, the court need not address the question of counsel's performance. *Id.* at 697.

## III.

Day's issue on appeal is whether the district court erred when it declined to apply *Draughon v. Dretke* to her case, concluding that *Draughon* applies only to death penalty cases.[6] The district court's determination that *Draughon*'s precedential value is limited to capital habeas cases is a conclusion of law, reviewed *de novo* by this Court. *Gomez*, 529 F.3d at 327.

*Draughon* was a capital habeas appeal in which a panel of this Court affirmed a district court's determination that a state court unreasonably applied *Strickland* to Draughon's ineffective assistance of counsel claim. Draughon was convicted for murder as a result of a shooting that occurred during an attempted robbery. The evidence at trial showed that Draughon fired a number of bullets as he attempted to escape a crowd that had gathered in the parking lot of a restaurant while he was attempting to rob the establishment. One of the bullets struck and killed one of the gatherers. Draughon contended at trial that he was merely attempting to fire shots into the air to scare away his pursuers and that he did not intend to kill anyone. To controvert Draughon's theory, the State presented a ballistics expert who testified that nothing on the bullet recovered from the victim showed that it hit an object and ricocheted before striking the victim. Thus, the State argued – and the jury apparently agreed – that Draughon intended to fire directly at the victim. Draughon's counsel did not present ballistics evidence during trial or obtain a ballistics expert to assist in the defense.

---

[6] The State does not argue that *Draughon* is confined to capital cases. Rather, the State argues that the district court's holding may be affirmed regardless of its treatment of *Draughon*.

During the subsequent federal habeas proceeding, Draughon presented a ballistics expert who analyzed the bullet and concluded that the bullet displayed characteristics that would suggest it had hit an object and ricocheted before striking the victim. The federal district court determined – and this Court agreed – that Draughon's trial counsel rendered ineffective assistance by failing to obtain expert forensic examination of the path of the fatal bullet fired from petitioner's gun. Trial counsel's "failure to investigate the forensics of the fatal bullet deprived Draughon of a substantial argument, and set up an unchallenged factual predicate for the State's main argument that Draughon intended to kill." *Draughon*, 427 F.3d at 296.

This Court did not explicitly limit *Draughon*'s applicability to capital cases, and we can see no other grounds for so limiting *Draughon*. Day seeks to apply *Draughon*'s reasoning—that the failure to challenge expert testimony with a defense expert rendered counsel's assistance ineffective because it deprived the defendant of a substantial argument and set up an unchallenged factual predicate for the State's main argument—to the facts of her case. It is difficult to understand how the principles announced in *Draughon* are or were intended to apply only to capital cases.

To the contrary, this Court has frequently applied to non-capital cases principles of general applicability announced in capital cases. For example, in *Williams v. Taylor*, 529 U.S. 362 (2000), a federal habeas case arising from a conviction that resulted in a death penalty sentence, the Supreme Court clarified the law regarding proper review of habeas corpus attacks on state convictions. This Court applies *Williams* to capital and non-capital cases alike. *See, e.g.*, *Young v. Dretke*, 356 F.3d 616, 623-24 (5th Cir. 2004). *Strickland v. Washington*, the case the district court applied in denying habeas relief, was itself a capital habeas appeal. The district court's limitation of *Draughon*'s applicability to capital cases thus appears arbitrary, would contradict precedent in which

generally applicable principles have been applied to capital and non-capital cases alike, and would call into question the continued application to non-capital cases general principles announced in capital cases.

## IV.

The above notwithstanding, independent grounds exist in the record for affirming the denial. *See Scott v. Johnson*, 227 F.3d 260, 262 (5th Cir. 2000) ("[T]his Court may affirm the denial of habeas relief on any ground supported by the record.") (citation omitted).[7]

## A.

Day contends that her trial counsel rendered ineffective assistance by failing to call a medical expert to rebut the testimony of the State's medical experts. This claim is in many respects similar to Draughon's. The State's case that Emma's and Nathan's injuries were caused within the time frame in which the children were in Day's care was premised largely on the State's medical

---

[7] Day contends that a holding that the district court erred by improperly limiting precedent compels remand of the matter for the district court's reconsideration. This is not so where, as here, grounds exist in the record for affirming the habeas denial regardless of the district court's error. *See Scott v. Johnson*, 227 F.3d at 262.

In her reply brief, Day further contends that the State's "assertion that the facts are not comparable to *Draughon* cannot be adequately analyzed without further development of the record." To the extent Day seeks remand for further factual development of her claim, that request must be denied. Requests for an evidentiary hearing are evaluated under 28 U.S.C. § 2254(e)(2). *Murphy v. Johnson*, 205 F.3d 809, 815 (5th Cir. 2000). Section 2254(e)(2) provides:

> If the applicant has failed to develop the factual bases of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—(A) the claim relies on—(i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

Day has not attempted to make any of the required showings. Further, the record suggests Day had an opportunity to develop the factual basis for her claim in state court.

expert testimony. Given counsel's seeming failure to challenge the State's medical expert testimony, Day apparently had little more than her own testimony to persuade the jury that the injuries were not caused during the time frame that the children were in her care.

Nevertheless, Day fails to satisfy the prejudice showing required for ineffective assistance claims based on counsel's failure to call a witness. This Court has repeatedly held that complaints of uncalled witnesses are not favored in federal habeas corpus review because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have stated are largely speculative. *Bray v. Quarterman*, 265 F. App'x 296, 298 (5th Cir. 2008). Thus, to prevail on an ineffective assistance claim based on counsel's failure to call a witness, the petitioner must name the witness, demonstrate that the witness was available to testify and would have done so, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable to a particular defense. *Id.* (citing *Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985)). We have required this showing for claims regarding uncalled lay and expert witnesses alike. *See, e.g.*, *Evans v. Cockrell*, 285 F.3d 370, 377-78 (5th Cir. 2002) (rejecting uncalled expert witness claim where petitioner failed to present evidence of what a scientific expert would have stated); *U.S. v. Doublin*, 54 F. App'x 410 (5th Cir. 2002).

Although Day presented Dr. Galaznik's lengthy affidavit in which Galaznik analyzes and rebuts much of the State's medical expert testimony, nowhere in the affidavit does Galaznik state that he was available to testify at trial, that he would have done so, or that he would have testified in accord with the opinions and conclusions he states in his affidavit. In fact, Day admits in her reply brief that she "has not claimed trial counsel should have hired Dr. Galaznik himself or someone whose views are similar to his. Instead, throughout the proceedings in the State courts and the federal district court she

17

has pointed to trial counsel's neglect, not only to secure any defense expert, but his failure to properly challenge the State's experts via cross-examination." Day continues: "Had counsel investigated the case to any reasonable degree, the inexactness of medicine and the differences of opinion among doctors entail that he would easily have found something more than the perfunctory and peripheral things he used to attempt to challenge the State's conclusions." Day's uncalled expert witness claim encounters the exact problem of speculation that the Fifth Circuit seeks to avoid by requiring the prejudice showing set forth in *Alexander v. McCotter*. Without making that showing, Day is asking the Court to take the leap of faith that counsel "would have found something" that may have created a different result at trial had counsel performed as Day proposes.

Day contends that this result improperly adds unnecessary elements to *Strickland*'s prejudice analysis. In support, Day points to the *Draughon* opinion, which did not analyze whether the petitioner's ballistics expert was available to testify at trial and would have testified favorably. But the issues of the expert's availability or willingness to testify favorably were not before the *Draughon* panel. Moreover, *Strickland* itself requires this specific showing for uncalled witness claims: "In order for the appellant to demonstrate the requisite *Strickland* prejudice, the appellant must show not only that this testimony would have been favorable, but also that the witness would have testified at trial." *Alexander*, 775 F.2d at 603 (citations omitted). Day's contention that this analysis adds unnecessary elements to *Strickland*'s prejudice analysis is thus contrary to the Court's prior holdings.

Moreover, even if Day's trial counsel had presented an expert who testified in accord with Galaznik's opinions, there would still not be a reasonable probability that the uncalled witness would have changed the jury's conclusion that the children were injured at a time when they were in Day's care. The jury heard ample evidence – including Day's testimony and statements made by Day

18

to other witnesses, some of which were recorded and played to the jury – that Day believed the injuries were caused by accidents that occurred while the children were in Day's care. Nathan's mother, Marie Brown, Richie Dean Rhyans, and Detective Mike Johnson testified that Day explained to each of them respectively that she thought Nathan's injuries occurred or possibly occurred when another heavier child in her care fell on Nathan's legs. Referring to the accident, she told Detective Johnson that "I'm pretty sure it happened over here." Similarly, Emma's mother, Nathan's mother, Rhyans, and Detective Johnson testified that Day explained to each of them respectively that she believed Emma's injuries occurred when Emma's brother pushed Emma out of a swing. Day told Emma's mother "If anybody's going to get in trouble for this, it's going to be me because I–because they were in my care, and they were at the day care." Day told consistent stories at trial, although she expressed her lack of certainty as to how the injuries occurred. Given the wealth of evidence that Day herself believed the injuries resulted from accidents that occurred while the children were in Day's care, it is difficult to believe that expert testimony questioning the experts' conclusions regarding the time of injury would have changed the result at trial. Indeed, such testimony may have called into question Day's candor and ultimately proved counter-effective. Thus, Day failed to prove prejudice, and the district court did not err in its conclusion that the state court did not unreasonably apply *Strickland* with respect to Day's uncalled witness claim.

## B.

Day also contends that her defense counsel failed to challenge adequately the testimony of the State's medical experts through cross-examination. Again, the district court concluded that Day failed to establish the prejudice element, adopting the Magistrate Judge's conclusion that Day "failed to demonstrate a reasonable probability that the result of the trial would have been different, but

for counsel's unprofessional error in . . . failing to cross examine the State's experts."

Day's argument again suffers from speculation. As with her claim regarding counsel's failure to secure the assistance of a medical expert, Day merely "point[s] to trial counsel's neglect [in] his failure to properly challenge the State's experts via cross-examination" and speculates that "[h]ad counsel investigated the case to any reasonable degree, the inexactness of medicine and the differences of opinion among doctors entail that he would easily have found *something* more than the perfunctory and peripheral things he used to attempt to challenge the State's conclusions." Day does not offer a concrete explanation of the testimony that alleged proper cross-examination would have elicited. Although Day offered the affidavit of Dr. Galaznik, who opined that evidence existed to challenge the State's intentional conduct theory and the State's evidence that placed the time of the injuries at the time of Day's care, Day admits that she "has not claimed trial counsel should have hired Dr. Galaznik himself or someone whose views are similar to his." Day's mere allegation of inadequate performance during cross-examination is thus conclusory and does not permit the Court to examine whether counsel's failure prejudiced her. *See United States v. Irby*, 103 F.3d 126 (5th Cir. 1996) (unpublished) (denying ineffective assistance claim based on counsel's failure "to adequately cross-examine a number of government witnesses" because petitioner "fail[ed] to set forth ... the possible impact of any additional cross-examination"); *Lincecum v. Collins*, 958 F.2d 1271, 1279 (5th Cir. 1992) (denying habeas relief where petitioner "offered nothing more than the conclusory allegations in his pleadings" to support claim that counsel was ineffective for failing to investigate and present evidence). Again, the Court must affirm the district court's conclusion that the state court did not unreasonably apply *Strickland* because Day failed to prove prejudice under *Strickland*.

## C.

Finally, Day contends that her trial counsel was ineffective for failing to review the State's medical records prior to trial. The district court concluded that Day failed to demonstrate the requisite prejudice with respect to this claim.

Trial counsel's failure to review the prosecution's file prior to trial can, in certain circumstances, constitute performance that falls below the level of reasonable performance. *See, e.g.*, *Rompilla v. Beard*, 545 U.S. 374 (2005). Nevertheless, the state habeas court specifically determined that Day's counsel adequately reviewed all of the State's medical records, and a presumption of correctness applies to the state court's explicit findings of fact. 28 U.S.C. § 2254(e)(1); *Valdez v. Cockrell*, 274 F.3d 941, 948 n.11 (5th Cir. 2001). The federal habeas court must defer to the state court's factual findings unless the petitioner rebuts those findings with clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Day did not (and does not now) attempt to rebut those factual findings.[8] The federal court must therefore presume that Day's counsel adequately reviewed all of the State's medical records, precluding a finding that Day's counsel's performance was deficient. Further, for the reasons stated above, Day again fails to demonstrate that she was prejudiced by her counsel's alleged failure. Assuming Day's counsel did fail to examine adequately the State's medical evidence, Day does not demonstrate what counsel would have discovered by a review of the State's file that was not found during counsel's preparations for the case. Nor does Day demonstrate a reasonable probability that discovery of any such information would have altered the outcome at trial.

---

[8] Day seeks remand in part for further factual development. Day does not contend that the limited grounds for holding an evidentiary hearing in the federal habeas proceeding are satisfied. *See* 28 U.S.C. § 2254(e)(2). Moreover, it is unlikely that Day would be able to satisfy the requirements of section 2254(e)(2). Further, Day did not request remand for further factual development until her reply brief. Day has therefore waived the argument. *See Linbrugger v. Abercia*, 363 F.3d 537, 541 n.1 (5th Cir. 2004).

Day's claim of prejudice is thus inadequate as conclusory. *See Miller v. Johnson*, 200 F.3d 274, 282 (5th Cir. 2000); *Anderson v. Collins*, 18 F.3d 1208, 1220-21 (5th Cir. 1994). The state habeas court thus did not unreasonably apply *Strickland* to Day's claim that her counsel was ineffective for failing to review the medical records.

## V.

We AFFIRM the judgment of the district court.