# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

January 5, 2010

Charles R. Fulbruge III
Clerk

No. 09-70012

SUZANNE MARGARET BASSO

Petitioner-Appellant

v.

RICK THALER, Director, Texas Department of Criminal Justice,
Correctional Institutions Division

Respondent-Appellee

Appeal from the United States District Court
For the Southern District of Texas, Houston Division

Before DAVIS, GARZA, and PRADO, Circuit Judges.

PER CURIAM:[*]

Petitioner Suzanne Basso requests a certificate of appealability (COA) to appeal the federal district court's denial of habeas corpus relief under 28 U.S.C. § 2254. Because reasonable jurists would not find that district court's rejection of her claims debatable, we deny her request.

## I.

The Texas Court of Criminal Appeals ("TCCA") summarized the facts of the offense in its direct appeal opinion as follows:

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

In July of 1997, 59-year-old Louis "Buddy" Musso, the victim in this case, first met either [Basso] or her son, James "J.D." O' Malley, at a church carnival in New Jersey. Musso, though mentally retarded, lived independently, held a job at a local grocery store, and handled his own financial affairs. In June of 1998, Musso left New Jersey to live with [Basso] in Jacinto City, Texas. Shortly after Musso moved in with [Basso], Al Becker, Musso's Social Security representative payee and friend of twenty years, began having difficulty contacting Musso. Becker had numerous telephone conversations with [Basso], but [Basso] eventually refused to allow him to communicate directly with Musso. Concerned about Musso's welfare, Becker sought assistance from various state agencies, but was not able to gain any further information about Musso's situation.

In July of 1998, [Basso] unsuccessfully attempted to designate herself as Musso's representative payee of his Social Security benefits. On an application for a life insurance policy on Musso, [Basso] was named beneficiary, and she had described herself as Musso's "wife to be." After Musso's death, police found certificates of insurance for policies in Musso's name, including one that provided $65,000 in the event of Musso's death from violent crimes. They also discovered a document entitled Musso's "Last Will and Testament," which purported to leave Musso's entire estate to [Basso] while "no one else [was] to get a cent."

In the days leading up to his death, Musso suffered tremendous abuse at the hands of [Basso] and her five co-defendants. [Basso] would take Musso to the apartment of co-defendants Bernice Ahrens, Craig and Hope Ahrens (Bernice's son and daughter), and Terence Singleton (Hope's fiancé), where Musso was forced to remain seated or in a kneeling position on a plastic mat in the hallway for hours. Whenever Musso attempted to get off the mat, O'Malley would beat or kick him. O'Malley, Singleton, Bernice, and Craig beat Musso, and O'Malley, while wearing combat boots, kicked him repeatedly. [Basso] beat Musso with a baseball bat on the buttocks, back, and groin area, and both she and Hope struck him with a belt and buckle. After hearing that Musso had been "misbehaving" while she was away from the apartment, [Basso], who weighed over 300 pounds, repeatedly jumped on top of Musso while he was on his hands and knees, causing him to fall flat on the ground. At one point, Musso requested that someone there call an ambulance. Even though Hope, as she later admitted,

recognized the extent of Musso's injuries, he received no medical attention. Someone (the evidence suggests either O'Malley or Singleton and Craig) bathed Musso in a solution of bleach and Pine-Sol cleaning fluid, using a wire brush on his body. Apparently, his killers were giving Musso this kind of "bath" when he died.

On the morning of August 28, 1999, Musso's body was found dumped near a roadway in Galena Park. Because Musso's clothes lacked any blood stains, and his only shoe was on the wrong foot, investigators believed that his body had been dressed after he died. The medical examiner reported an extraordinary number of injuries to Musso's body and was unable to count the "hundreds" of bruises that covered Musso from head to toe. The palms of Musso's hands and the soles of his feet were bruised, while his back and buttocks showed numerous lash marks indicative of his having been whipped. Musso's severely blackened eyes resulted from a "hinge fracture" to his skull, which probably was caused by a blow to the back of the head. He had sustained broken bones in his nose, ribs, and throat. Marks on his back appeared to be cigarette burns, but may have been caused by a hot poker, and the medical examiner noted areas of skin abrasion possibly attributable to contact with a cleaning solution or scrub brush. The cause of death was believed to have been a skull fracture from an unknown object, which left a large, X-shaped laceration in Musso's scalp.

On the evening before Musso's body was discovered, [Basso] began what evolved into a lengthy attempt to establish that Musso had run away. She made several phone calls to people, including Becker, a niece of Musso's, and the local police, expressing concern about Musso's whereabouts. [Basso] claimed that Musso probably had run away with a "little Mexican lady" that he had met at a laundromat and said that she was "getting kind of worried" about him. In a written statement to police, [Basso] later confessed to having driven Bernice Ahrens's car, with Musso's body in the trunk, to the site where O'Malley, Singleton, and Craig Ahrens dumped the body. She also admitted driving the car to the dumpster where the others disposed of additional incriminating evidence, including bloody clothes and rubber gloves, which the police had found as a result of O'Malley's confession.

*Basso v. State*, slip op. at 2-5.

Basso was convicted of capital murder and sentenced to death for her participation in the killing of Louis Musso. Her conviction and death sentence were upheld by the TCCA on direct appeal. *Basso v. State*, No. 73672, 2003 WL 1702283 (Tex. Crim. App. Jan. 15, 2003)(en banc) (unpublished), *cert. denied*, 540 U.S. 864 (2003). Basso's application for writ of habeas corpus was denied by the TCCA based on the trial court's recommended findings of fact and conclusions of law. *Ex parte Basso*, No. WR-63672-01, 2006 WL 2706771 (Tex. Crim. App. Sept. 20, 2006)(unpublished). The federal district court denied Basso's petition for federal habeas relief. *Basso v. Quarterman*, No. H:07-3047 (S.D. Tex. Jan. 26, 2009)(unpublished). Petitioner's appeal and application for certificate of appealability followed.

## II.

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a petitioner must obtain a COA before appealing the district court's denial of habeas relief. 28 U.S.C. § 2253(c)(2). "This is a jurisdictional prerequisite because the COA statute mandates that '[u]nless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals. . . .'" *Miller-El v. Cockrell,* 537 U.S. 322, 323, 123 S.Ct. 1029, 1039 (2003) (citing 28 U.S.C. §2253(c)(1)) . "The COA statute . . . requires a threshold inquiry into whether the circuit court may entertain an appeal." *Id.* (citing *Slack v. McDaniel,* 529 U.S. 473, 482 (2000); *Hohn v. United States,* 524 U.S. 236, 248 (1998)). A COA will be granted only if the petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make such a showing, a petitioner "must demonstrate that the issues are debatable among jurists of reason; that a court *could* resolve the issues [in a different manner]; or that the questions are adequate to deserve encouragement to proceed further." *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4

(1983) (citation and internal quotation marks omitted). Any doubt regarding whether to grant a COA is resolved in favor of the petitioner, and the severity of the penalty may be considered in making this determination. *Fuller v. Johnson*, 114 F.3d 491, 495 (5th Cir. 1997).

The analysis "requires an overview of the claims in the habeas petition and a general assessment of their merits." *Miller-El,* 537 U.S. at 336. The court must look to the district court's application of AEDPA to the petitioner's constitutional claims and determine whether the court's resolution was debatable among reasonable jurists. *Id.* "This threshold inquiry does not require full consideration of the factual or legal bases adduced in support of the claims." *Id.* Rather, "'[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.'" *Id.* at 338. (citing *Slack v. McDaniel,* 529 U.S. 473, 484 (2000)).

## III.

Basso's first three grounds of error are related and arise out of the fact that Basso was medicated during the course of the trial without the knowledge of her counsel. In June 1999, prior to her trial, Basso was referred to mental health professionals assigned to Harris Country Jail because she had expressed suicidal tendencies. Basso reported that she did not intend to commit suicide, but needed medication to relieve her anxiety. The physician assigned to the jail prescribed Zoloft, an antidepressant, and Trazodone, a sleep aid, after discussing the medications with Basso and with Basso's consent. Relying on *Riggins v. Nevada*, 504 U.S. 127 (1992), Basso argues that this violated her right to due process under the Fifth and Fourteenth Amendments, her right to demonstrate her true mental state to the jury, and her right to effective representation by counsel, as she was unable to communicate effectively with her attorneys during trial.

In *Riggins*, the defendant was prescribed antipsychotic drugs during his pretrial detention. Before trial, the defense requested that he be taken off the medication to allow them to present an insanity defense. The trial court denied the motion. The Supreme Court held that medicating a defendant against his will could violate his due process rights absent a showing of medical necessity. *Id.* at 135-37.

In contrast to *Riggins*, Basso received the medication at her own request and with her consent. The district court recognized that there is no authority holding that voluntary administration of medication violates her right to due process and no authority holding that the State has a duty to inform defense counsel of medication a defendant is receiving or generally to inform counsel of facts known to the defendant. In addition, Basso was found competent to stand trial while on the medication, a finding that Basso does not contest. The district court's determination of these issues is not debatable and COA is denied.

IV.

Basso argues next in her fourth and sixth claims that her counsel was ineffective at the punishment stage of trial for failing to investigate and present mitigating evidence. During state habeas proceedings, Basso submitted several documents which she claimed contained significant mitigating evidence that should have been discovered by counsel and presented during the punishment phase of her trial. These documents included evidence that Basso was raised in poverty; her natural father was an abusive alcoholic who abandoned his family; she was sexually molested by her step-father, step-brother, and uncle; she was physically abused by her mother and step-father; she witnessed her brothers being abused in a manner similar to the abuse Musso received from Basso and her co-defendants; Basso was emotionally disturbed and performed poorly in school; and she had befriended a retarded individual when she was young.

These claims were rejected by the state habeas court based largely on the testimony of Basso's trial attorneys. Her trial counsel asserted that they had contact with Basso's family and were aware, in general terms, of the evidence Basso now presents. They also reviewed Basso's medical records and researched the complaints contained therein, interviewed court-appointed mental health experts, and employed the services of two psychologists who interviewed Basso and testified about their findings. After considering the evidence, they decided not to present it because it would support the state's portrayal of Basso as a malingerer, manipulator and liar. Her trial counsel decided against presenting evidence of sexual abuse Basso suffered as a child, because of the similarity of it to the abuse Basso and her co-defendants inflicted on Musso.

The state habeas court concluded that "counsel cannot be considered ineffective for not pursuing and/or presenting evidence of [Basso's] background that, by its very nature concerning [Basso's] character, would strengthen the State's case against [her]." The court also found that Basso failed to show that there was a reasonably likelihood that the evidence would have affected the outcome of the penalty phase of the trial. The district court agreed and denied federal habeas relief. Those decisions are not debatable among jurists of reason.

This court reviews claims for ineffective assistance under *Strickland's* two-prong test: (1) that counsel's performance was deficient; and (2) that counsel's alleged error prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Day v. Quarterman*, 566 F.3d 527, 536 (5th Cir. 2009). Under *Strickland* we are required to defer to counsel's decision not to present certain mitigating evidence when that decision, as the one in this case, is fully informed and strategic in the sense that it is designed to avoid harm to the defense. *Moore v. Johnson*, 194 F.3d 586, 615 (5th Cir. 1999). This court has repeatedly denied claims of ineffective assistance of counsel for failure to present "double-

edged" evidence where counsel made an informed decision against presenting it. *Martinez v. Dretke*, 404 F.3d 878, 889 (5th Cir. 2005); *Johnson v. Cockrell*, 306 F.3d 249, 253 (5th Cir. 2002). Accordingly, Basso is not entitled to COA on this claim.

V.

Basso also seeks COA on her claim that the trial court refused to appoint a mitigation expert in violation of her Fourteenth Amendment right to due process. During trial, Basso's counsel filed a motion seeking $12,500 to retain Mark Cunningham, Ph.D. as a mitigation specialist. The trial court denied the motion.

On federal habeas review, error is harmless unless it had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993)(internal quotation marks and citation omitted). Basso bears the burden on this point. *See Id.* at 637 (stating that "habeas petitioners . . . are not entitled to habeas relief on trial error unless they can establish that it resulted in 'actual prejudice.'")(citing *United States v. Lane*, 474 U.S. 438, 449(1986)). Her argument ignores her burden on habeas review and argues simply that the denial violated her right to due process. Basso's petition refers only to the mitigation evidence that habeas counsel was able to discover post trial. As discussed previously in regard to Basso's ineffective assistance claim, Basso's defense was generally aware of the evidence that the mitigation expert may have discovered and made a strategic decision not to use it because it would not have helped Basso's defense at the punishment phase. Basso has not met her burden of establishing that any error in the trial court's denial of funds for a mitigation expert had a "substantial and injurious effect or influence" on the jury's verdict. Reasonable jurists would not debate this claim and COA is denied.

## VI.

Basso argues next that the trial court erred in failing to instruct the jury that the state had the burden of proof beyond a reasonable doubt on the mitigation issue at the punishment phase of the trial, denying Basso due process of law under the Fourteenth Amendment. No COA should issue on this claim because, as the district court noted, "[n]o Supreme Court or Circuit precedent constitutionally requires that Texas's mitigation special issue be assigned a burden of proof." *Rowell v. Dretke*, 398 F.3d 370, 378 (5th Cir. ), *cert. denied*, 126 S.Ct. 103 (2005).

## VII.

Finally, Basso claims that the trial court denied her a trial satisfying the Eighth Amendment's heightened reliability requirement by not answering the jury's specific request for a definition of the key phrase "criminal acts of violence." During penalty phase deliberation, the jury sent a note to the trial judge asking for a definition of the phrase "criminal acts of violence," as used in the future dangerousness special issue.[1] The judge declined to give any definition other than that given in the jury instructions. Basso acknowledges, correctly, that it is well established in the case law that certain terms in the future dangerousness special issue need not be defined. *See, e.g. West v. Johnson*, 92 F.3d 1385, 1406 (5th Cir. 1996), *cert. denied*, 520 U.S. 1242 (1997); *Woods v. Johnson*, 75 F.3d 1017, 1033-34 (5th Cir.), *cert. denied*, 519 U.S. 854 (1996). Basso cites no case law to support her position that a jury request for a

---

[1] The future dangerousness special issue asks "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." Tex. Code Crim. Proc. Art. 37.071 §2(d).

definition changes the Eighth Amendment analysis. COA on this issue is denied.

## VIII.

None of the claims raised by Basso are sufficient to merit the grant of COA in her favor. For the foregoing reasons, we deny her application for COA. COA DENIED.