PER CURIAM:
Denied. In 2004, a Calcasieu Parish jury found relator, Jason M. Reeves, guilty of the first degree murder of four-year-old M.J.T.[1] At trial, the state presented evidence that Reeves abducted, raped, and murdered M.J.T. on the afternoon of November 12, 2001. The state's evidence linking Reeves to the murder included semen matching Reeves's DNA profile recovered from M.J.T.'s anus, fibers and dog hairs linking the victim's clothing to Reeves's vehicle, man-trailing dog evidence which tracked Reeves's scent to critical areas associated with the crime, witness statements placing Reeves and his vehicle at the trailer park from which M.J.T. was abducted and the cemetery near which her body was found, and a confession.
After finding Reeves guilty as charged, jurors unanimously agreed to impose a sentence of death in light of the aggravating circumstances that Reeves was engaged in the perpetration or attempted perpetration of aggravated rape at the time of the murder; that the victim was under the age of 12 years; and that the offense was committed in an especially heinous, atrocious, or cruel manner. The trial court sentenced Reeves to death by lethal injection in accord with the jury's determination. This Court affirmed the conviction and sentence. State v. Reeves , 06-2419 (La. 5/5/09), 11 So.3d 1031, cert. denied , 558 U.S. 1031, 130 S.Ct. 637, 175 L.Ed.2d 490 (2009).
In 2009, Reeves filed a pro se "shell" application for post-conviction relief. Through counsel, Reeves subsequently amended and supplemented his original application to allege some 18 claims for relief. Two of those claims have already been fully litigated. See State ex rel. Reeves v. Vannoy , 16-2199 (La. 1/23/17), 209 So.3d 87 (finding no abuse of the district court's discretion in denying Reeves's request to further supplement his application for post-conviction relief with a claim under Penry v. Lynaugh , 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989) ); State v. Reeves , 15-1668 (La. 4/4/16), 188 So.3d 257 (denying writs because Reeves failed to prove by a preponderance of the evidence that he suffers from a mental disability that renders him ineligible for execution). The district court denied three other claims on procedural grounds and dismissed four others without prejudice.
Thereafter, the district court conducted an evidentiary hearing to address the remaining nine claims, all of which urged ineffective assistance of trial counsel. It heard testimony from Kerry Cuccia (lead defense counsel from Reeves's first trial), now-Judge Ronald Ware (lead defense counsel from Reeves's second trial), Rick Bryant (the district attorney who prosecuted Reeves in both trials), and Cynthia *670 Killingsworth (an assistant district attorney who aided Bryant in both trials). The district court also considered a deposition from Charles St. Dizier, a member of Ware's team in the second trial whose primary responsibility was in the penalty phase. After consideration of this evidence, the district court denied each claim, finding them meritless.
Reeves now assigns eight errors and seeks review of the district court's denial of 10 of his post-conviction claims for relief (one procedural ruling and nine merits rulings). For the following reasons, the district court reached the correct result in denying the application for post-conviction relief.
In State v. Lee , 14-2374, pp. 8-9 (La. 9/18/15), 181 So.3d 631, 638, another post-conviction capital case, we explained that an "attempt to re-litigate a claim that has been previously disposed of, by couching it as a post-conviction ineffective assistance of counsel claim, [should be] generally unavailing." As we found in Lee , Reeves's post-conviction ineffective assistance of counsel claims predicated upon issues which were in fact resolved on appeal are not truly new claims. The district court correctly dismissed Reeves's first claim-that Ware and his team suffered from "forced ineffectiveness" as a result of their appointment with just over six months to prepare for trial-under La.C.Cr.P. art. 930.4(A). On direct review, this Court devoted considerable attention to the propriety of this substitution of counsel under the circumstances of this case, and we expressly addressed the contention that the trial court erred in failing to grant a continuance. See Reeves , 06-2419, pp. 12-74, 11 So.3d at 1042-79. Reeves's standalone "forced ineffectiveness" claim finds itself predicated upon these same issues and is barred from review.
Next, Reeves argues that Ware rendered ineffective assistance by failing to utilize three experts called by Cuccia in the first trial: 1) a DNA expert to testify that the sample recovered from the victim's anus was "too pristine" given the circumstances of where and when her body was located; 2) a fingerprint expert who purportedly would have testified that the latent prints found on the victim's arm and inner thigh could exclude Reeves as a source; and 3) a traffic engineer to cast doubt upon the state's proposed timeline of events.
Under the standard for ineffective assistance of counsel set out in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), a reviewing court must reverse a conviction if the petitioner establishes (1) that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms; and (2) that counsel's inadequate performance prejudiced defendant to the extent that the trial was rendered unfair and the verdict suspect. Whether to call a witness is within the ambit of trial strategy. See State v. Johnson , 619 So.2d 1102, 1109 (La. App. 4 Cir. 1993).
Ware explicitly testified at the evidentiary hearing that he did not have a strategic reason for opting not to call any of these witnesses. However, he did not testify that he was unaware of these witnesses because of any lack of preparation; instead, Ware stated he felt "certain" and "sure" that he reviewed these witnesses' testimony from the first trial. He cited no funding issues with respect to securing the presence of any of these witnesses, but in one case-concerning the fingerprint expert-he explained that there might have been trouble locating the witness.
*671 It is simply impossible to determine from the evidence elicited at the evidentiary hearing why Ware did not call at least two of these proposed witnesses. "Judicial scrutiny of counsel's performance must be highly deferential.... Even the best criminal defense attorneys would not defend a particular client in the same way." Strickland , 466 U.S. at 689, 104 S.Ct. at 2065. That Ware proceeded differently than did Cuccia is not itself indicative of deficient performance, especially where Ware's testimony lends little insight into exactly why these witnesses were not called.
Even assuming deficient performance, however, Reeves has failed to prove resultant prejudice. Though these three witnesses may have cast doubt upon certain portions of the state's case, the evidence introduced at the post-conviction proceedings does not rise to the level of proving that the omission of this testimony at the second trial "more likely than not altered the outcome in the case." See Strickland , 466 U.S. at 693, 104 S.Ct. at 2068. In addition to the evidence these witnesses' testimony may have undermined, the state also presented fiber evidence, man-trailing dog evidence, eyewitness identifications, and Reeves's confession. This claim lacks merit.
Next, Reeves asserts that Ware failed to take adequate steps to challenge or otherwise confront the state's evidence from the man-trailing dog handler, including securing a defense expert to attack the dog's reliability and challenging the dog's qualifications.
The man-trailing dog and its handler were the subject of an assigned error on direct appeal. At that time, Reeves argued that the trial court erred in failing to hold a Daubert hearing concerning the dog and handler's expertise. This Court explained that Ware objected both pretrial and at trial to the introduction of this evidence, and:
Thereafter, Mark Holmes, a detective with the Port Arthur, Texas Police Department, and the K-9 handler for the man-trailing dog which participated in the investigation of this matter, "Bo," was examined in the presence of the jury on his own training, certification, and experience, as well as on his dog's pedigree, training and experience. Only after this foundation was laid did the state elicit testimony regarding their involvement in the investigation.
Reeves , 06-2419, p. 110 (unpub'd appx.).
Thus, the dog and handler's qualifications were probed before the jury, even if Ware himself might not have "challenged" them. While Ware expressed some regret at the evidentiary hearing about how he handled the cross-examination of this witness, counsel's choices of which questions to ask on cross-examination fall well within the ambit of trial strategy. See , e.g. , State v. Brooks , 94-2438, pp. 6-7 (La. 10/16/95), 661 So.2d 1333, 1337. Although Ware could not articulate at the evidentiary hearing why he failed to ask certain questions of the dog handler, Reeves's current claims rely improperly upon the "distorting effects of hindsight" cautioned against in Strickland , 466 U.S. at 689, 104 S.Ct. at 2065.
Additionally, though Reeves faults Ware for failing to call a counter-expert, he fails to demonstrate that funding was (or could have been made) available or the nature of that proposed expert's testimony. See La.C.Cr.P. art. 930.2 ; see also Day v. Quarterman , 566 F.3d 527, 538 (5th Cir. 2009) ("[T]o prevail on an ineffective assistance claim based on counsel's failure to call a witness, the petitioner must name the witness, demonstrate that the witness *672 was available to testify and would have done so, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable to a particular defense.").
Finally, even assuming that Reeves had demonstrated some level of deficient performance as to this claim, he nonetheless has failed to demonstrate resultant prejudice. The man-trailing dog evidence was hardly the lynchpin of the state's case, considering that the state also presented DNA evidence, fiber evidence, eyewitness identifications, and a confession. Even were this piece of the state's case to fall, there appears no reasonable probability of a different result in light of the substantial evidence of Reeves's guilt. This claim lacks merit.
Next, Reeves contends that Ware failed to discover and present statements or testimony from three lay witnesses who could have helped to cast reasonable doubt upon the state's case. Two women, Faith Watson and Michelle Mathis, each gave written statements that they had seen a young blonde girl, dressed in purple, running from an Eckerd's drug store on the afternoon of the abduction. Watson's statement indicated that she later saw a picture of the victim on the news and was "almost positive" she was the same girl from the drug store; Mathis's statement indicated she also later saw a picture of the victim on the news and it "was the same little girl" she had seen running from the drug store.
Separately, Calcasieu Parish Sheriff's Office Detective Shannon Daughenbaugh prepared a report indicating that she spoke with Floyd Simmons, a visitor at the victim's trailer park who "said he saw a white male in a truck he had never seen before in the trailer park about a week before [the victim] disappeared." When Daughenbaugh presented Simmons with a photographic lineup containing Reeves's picture, Simmons identified someone else but "was not sure if the person he picked was the person who he had seen in the trailer [park] a week prior."
With respect to the Watson and Mathis statements, Ware testified at the evidentiary hearing that he would have used them if he had been aware of them. However, their value to the defense appears minimal. While both Watson and Mathis indicated that the young girl they saw might have been the victim, they both described her as a blonde; Ware agreed with the state that the victim was a brunette, calling into question the identifications and their utility at trial.
Detective Daughenbaugh's description of Simmons's identification would have been even less helpful to Reeves. According to Detective Daughenbaugh's report, Simmons described seeing an unknown white male in a truck about a week before the victim disappeared. Simmons did not claim to have seen the perpetrator, but someone present in the trailer park well before the victim's abduction.
None of these witness statements gives rise to any logical fault within the state's evidence in support of Reeves's guilt. Their omission did not undermine the verdict rendered in their absence. Strickland , 466 U.S. at 693, 104 S.Ct. at 2068. This claim lacks merit.
Next, Reeves argues that Ware rendered ineffective assistance by failing to ensure that Reeves's videotaped confession was redacted in accordance with the parties' pretrial agreement. The essential nature of this claim was addressed on direct appeal in conjunction with a discussion about whether the trial court erred in denying a motion for mistrial based on the improper introduction of other crimes evidence *673 when the unredacted portion of the videotape was played for the jury. See generally Reeves , 06-2419, pp. 99-104 (unpub'd appx.). In rejecting that claim, the Court explained:
In total, the defense objected to two series of comments which were heard by the jury. One of the instances included comments between a law enforcement officer and Reeves indicating that, after his sister's death, Reeves started to have "problems" with, or started having an attraction toward, little boys and girls. The other set of comments was the interchange during which the defendant stated that he liked to work off-shore because he could easily get rid of the sexual thoughts he had about children and was able to stay out of trouble. These two brief instances of comments in the context of an hour-long videotape, which were so brief as to fail to motivate defense counsel to object, did not prejudice the defendant such that he could not receive a fair trial. We find no abuse of the trial court's discretion in denying the motion for mistrial in this circumstance.
Moreover, the erroneous introduction of other crimes evidence into a trial is subject to harmless error analysis. State v. Johnson , 1994-1379 p. 17-18 (La. 11/27/95), 664 So.2d 94, 101-102. Viewing these two brief statements in the context of the overwhelming evidence of guilt presented by the prosecution, we can state without doubt that the verdict actually rendered in this case was surely unattributable to the error.
Reeves , 06-2419, p. 104 (unpub'd appx.).
The instant claim, couched as a post-conviction ineffective assistance of counsel argument, is essentially an attempt to re-litigate the claim raised on appeal. That roundabout method of attack is prohibited. See La.C.Cr.P. art. 930.4(A) ; see also Lee , 14-2374, pp. 8-9, 181 So.3d at 638. Moreover, even if counsel can be said to have rendered deficient performance by failing to ensure that the videotape was properly redacted, Reeves fails to prove any resultant prejudice. As a result, this claim fails.
Next, Reeves asserts that Ware failed to take adequate steps in urging his Batson[2] objection. He urges that Ware should have drawn direct comparisons between seated white jurors and peremptorily challenged black jurors to make a prima facie showing of purposeful discrimination.
On direct appeal, this Court expressly rejected a claim that the trial court erred in finding no prima facie showing of purposeful racial discrimination:
First, the case itself presented no overt racial overtones. The defendant is white, as was his victim. Second, the trial court properly considered the timing of the defense objection. Although the objection was timely under our law in the sense that a Batson challenge is timely until the entire jury panel has been sworn together, this circumstance contrasts sharply with the situation in other cases where a defense attorney raises an objection immediately after a prospective juror is challenged and gives reasons. Third, the trial judge could and did take into consideration the overall tenor of the voir dire questioning. Our review shows that the prosecution used the same questions throughout its voir dire. There is no indication that any particular prospective jurors were "targeted" for questioning in any way. Fourth, the record shows that the ultimate make-up of the jury which considered this case was composed of five *674 black jurors and seven white jurors. "Although the mere presence of African American jurors does not necessarily defeat a Batson claim, the unanimity requirement of a capital case sentencing recommendation may be considered." State v. Tart , 1993-0772 p. 18 (La. 2/9/96), 672 So.2d 116, 141, cert. denied , 519 U.S. 934, 117 S.Ct. 310, 136 L.Ed.2d 227 (1996). Finally, the trial judge indicated clearly he found no discriminatory intent whatsoever. Here, the trial judge found: "Just numerically the ratio of the existing jury is higher than that of the entire panel, showing that if anything there was a propensity to be more minority-oriented than less minority-oriented." An analysis of the voir dire as a whole convinces us that the trial judge was correct in his determination that no prima facie showing of purposeful racial discrimination was met by the defense in its Batson objection.
Reeves , 06-2419, pp. 98-99 (unpub'd appx.).
Once again, Reeves improperly attempts to re-litigate an issue upon which he has already sought review; this Court has already found no prima facie showing of purposeful racial discrimination. While he now includes arguments that draw comparisons between a single seated white juror (Craig Phillips) and an excused black prospective juror (Ian Joseph), his side-by-side analysis is not persuasive.[3] The comparison cherry-picks between two jurors whose answers were more orthogonal to one another than they were conflicting. Moreover, it does not include the entirety of voir dire, which this Court considered on direct review. In short, Reeves cites no evidence this Court has not already assessed to support this Batson -related ineffective assistance claim. This claim lacks merit.
Next, Reeves contends that penalty-phase counsel St. Dizier failed to discover and present evidence and additional expert witnesses to help explain the effects of his difficult childhood, including the circumstances of his childhood commitment and the history of sexual abuse he suffered.
A defendant at the capital penalty phase is entitled to the assistance of a reasonably competent attorney acting as a diligent, conscientious advocate for his life. State v. Fuller , 454 So.2d 119, 124 (La. 1984) ; State v. Berry , 430 So.2d 1005, 1007 (La. 1983) ; State v. Myles , 389 So.2d 12, 28 (La. 1980) (on reh'g). Thus, counsel's role at capital sentencing resembles his role at the guilt phase in that he must "ensure that the adversarial testing process works to produce a just result ...." Burger v. Kemp , 483 U.S. 776, 788-89, 107 S.Ct. 3114, 3122-26, 97 L.Ed.2d 638 (1987). A finding of ineffective assistance of counsel at the penalty phase requires a showing that counsel failed to undertake "a reasonable *675 investigation [which] would have uncovered mitigating evidence," and that failing to put on the available mitigating evidence "was not a tactical decision but reflects a failure by counsel to advocate for his client's cause," which resulted in "actual prejudice." State v. Hamilton , 92-2639, p. 6 (La. 7/1/97), 699 So.2d 29, 32 (citing State v. Brooks , 94-2438 (La. 10/16/95), 661 So.2d 1333 ; State v. Sanders , 93-0001 (La. 11/30/94), 648 So.2d 1272 ). The ABA Guidelines provide an overview of the scope of counsel's duty to investigate at the penalty phase and provide that counsel explore, inter alia , the defendant's: medical history; family and social history (including physical, sexual or emotional abuse); mental illness and cognitive impairments; and substance abuse. ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (2003).
Reeves attached to St. Dizier's deposition several exhibits that he urges should have been discovered and used in mitigation. These exhibits highlight Reeves's familial history, instances of sexual abuse he suffered (and evidence of which was not presented at trial), and the general conditions of childhood commitment facilities in Louisiana around the time he was housed in one of them. In general, St. Dizier expressed that he would have used all of this evidence in mitigation if he had discovered it in preparing for trial.
On direct appeal this Court explained the available information concerning Reeves's background:
The Uniform Capital Sentence Report ("UCSR") and the Capital Sentence Investigation Report ("CSIR") indicate the defendant, Jason Reeves, is a white male born on January 8, 1975. He was 26 years old at the time of the offense. Defendant is unmarried and has no children or other dependents. He was living with his mother at the time he murdered M.J.T.
Reeves is one of three children born to the on-again, off-again common law union of Judy Ann Doucet and Larry Manuel Reeves. The defendant grew up in the rural community of LeBleu Settlement near Lake Charles and Iowa, Louisiana. Reeves' parents separated for a significant period of time during Reeves' early childhood, during which time his mother married Dennis Mott, whom Reeves' mother described as emotionally abusive to her and her children.
One of Reeves' siblings, Patricia Renee, was killed in a tragic accident in 1986, when Reeves was 9 or 10 years old. His other sibling, Ronald Wayne, is currently serving a life sentence at the state penitentiary for a murder he committed in 1994. Reeves was sexually abused by a friend of the family, George Reed, when he was 14 years old. Reed was charged with the aggravated rape of Reeves, but was allowed to plead guilty to aggravated crime against nature.
Reeves' parents indicated Reeves suffered from headaches and black outs from the time he was a small child but denied any mental health problems. He is of medium intelligence, with an IQ within the 70 to 100 range. Reeves dropped out of school before completing the 7th grade, where he was a below average student academically and a disciplinary problem. He has not obtained a GED. He has no other formal education or job training.
Reeves' past employment history is described in reports generally as "various labor positions" of unknown duration. For an unknown period of time, Reeves worked as a deckhand for an oil field related company. He was working as an insulator for an insulation company at the time he murdered M.J.T.
*676 At trial, the defense presented extensive evidence of Reeves' character and behavioral disorders, both to challenge the validity of the confession and in the penalty phase as mitigation. According to an expert forensic psychologist, Reeves suffers from major depression and mixed personality disorder, with borderline and anti-social personality traits. Another defense expert related that the defendant exhibits emotional instability, volatile interpersonal relationships, anger, mood swings and impulsivity. However, Reeves does not suffer from a mental disease or defect which would prevent him from being able to distinguish right from wrong.
Reeves had a prior criminal history. The UCSR and CSIR relate that Reeves had two juvenile adjudications for burglary, one occurring June 11, 1991, and the other occurring June 17, 1991. On October 10, 1991, he was adjudicated a delinquent and sentenced to four years at a juvenile detention facility. His adult record includes a conviction for indecent behavior with a juvenile, which occurred on January 3, 1996. He was sentenced to four years hard labor, with three years of the sentence suspended. His probation for this offense was revoked on May 5, 1997, when he pleaded guilty to another charge of indecent behavior with a juvenile, with this offense occurring on March 29, 1997. He was sentenced to four years and was released from incarceration on March 29, 2001, after serving the entirety of his sentence. The CSIR shows that at the time the report was completed, Reeves had two pending charges for obscenity, as well as simple battery and criminal trespass. As previously stated within this opinion, Reeves' conviction for attempted simple escape was reversed on appeal.
Reeves , 06-2419, pp. 87-89, 11 So.3d at 1087-88.
At trial, St. Dizier elicited testimony from a professor of criminal justice regarding the rarity of escapes from Angola and the unlikelihood of an offender serving a life sentence receiving a pardon or commutation. One of Reeves's penalty-phase experts testified that he had dysfunction in the portions of his brain controlling information processing and impulse control, and he suffered from post-traumatic stress disorder. A second penalty phase expert agreed with the diagnosis of PTSD. The jury heard testimony from Reeves's brother Ronald, mother, and middle school principal, who together painted a picture of his troubled childhood, including sexual abuse, distant parents, and a problematic family life.
In assessing a penalty-phase ineffective assistance of counsel claim, a court should first "determine whether a reasonable investigation would have uncovered mitigating evidence to be put to the jury in the penalty phase of the trial." State ex rel. Busby v. Butler , 538 So.2d 164, 169 (La. 1988). Nothing in the post-conviction proceedings sheds light upon exactly what steps post-conviction counsel undertook to obtain the information that Reeves now asserts St. Dizier should have used. Moreover, as St. Dizier acknowledged at the deposition, Reeves did not disclose to him any of the additional sexual abuse revealed in these newly discovered documents, meaning that the best potential source of this information proved most unhelpful to his own defense. As a result, it is not clear that St. Dizier failed to engage in a reasonable mitigation investigation.
Even if one assumes that Reeves has made such a showing, however, and that St. Dizier would have used this information if he had it, Reeves still must have suffered "actual prejudice due to the ineffectiveness of his counsel before relief will be *677 granted." Busby , 538 So.2d at 169. He has not made the required showing.
The jury found three applicable aggravating circumstances in this case: 1) that the offender was engaged in the perpetration or attempted perpetration of aggravated rape at the time of the murder; 2) that the victim was under the age of 12 years; and 3) that the offense was committed in an especially heinous, atrocious, or cruel manner. Reeves , 06-2419, pp. 81-85, 11 So.3d at 1084-86. As to the third aggravating factor, we noted:
The 4 year old victim was stabbed 16 times. The victim's hands showed defensive wounds, revealing her awareness of the assault, and her attempt to protect herself. The victim's neck was cut for two-thirds of its entire circumference. M.J.T.'s legs were scraped, showing she had been dragged. Although she sustained multiple stab wounds in the heart, the coroner testified that she survived for some time despite this incredible trauma.
Id. , 06-2419, p. 84, 11 So.3d at 1085.
The sentencing hearing shall focus on the circumstances of the offense, the character and propensities of the offender, and the victim, and the impact that the crime has had on the victim, family members, friends, and associates. La.C.Cr.P. art. 905.2(A). That Reeves suffered from a difficult childhood was undoubtedly relevant to his character and propensities. The jury heard a great deal of evidence that regard, but it still unanimously recommended a death sentence. While the additional evidence Reeves now points to might have further supported his case for mitigation, it is unlikely that it would have outweighed the particularly brutal and heinous circumstances of the offense. This claim lacks merit.
Finally, Reeves shows no grounds for relief based on his argument that the cumulative effect of the claimed errors rendered the proceedings fundamentally unfair. Although we have previously reviewed cumulative error arguments, we have never endorsed them. See, e.g., State v. Strickland , 94-0025, pp. 51-52 (La. 11/1/96), 683 So.2d 218, 239 ; State v. Taylor , 93-2201, (La. 2/28/96), 669 So.2d 364 (unpub'd appx.); State v. Tart , 93-0772, p. 55 (La. 2/9/96), 672 So.2d 116, 164 ; State v. Copeland , 530 So.2d 526, 544-45 (La. 1988) (citing State v. Graham , 422 So.2d 123, 137 (La. 1982) ). Given Reeves's failure to show prejudice as a result of any of the claimed errors, he cannot show that their combined effect entitles him to relief. See, e.g., Mullen v. Blackburn , 808 F.2d 1143, 1147 (5th Cir. 1987) (rejecting cumulative error claim, finding that "twenty times zero equals zero").
Relator has now fully litigated his application for post-conviction relief in state court. Similar to federal habeas relief, see 28 U.S.C. § 2244, Louisiana post-conviction procedure envisions the filing of a second or successive application only under the narrow circumstances provided in La.C.Cr.P. art. 930.4. Notably, the legislature in 2013 La. Acts 251 amended that article to make the procedural bars against successive filings mandatory. Relator's claims have now been fully litigated in accord with La.C.Cr.P. art. 930.6, and this denial is final. Hereafter, unless he can show that one of the narrow exceptions authorizing the filing of a successive application applies, relator has exhausted his right to state collateral review. The district court is ordered to record a minute entry consistent with this per curiam.

Reeves's first trial ended in a mistrial when the jury could not reach a unanimous verdict.

Batson v. Kentucky , 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

Reeves believes that Joseph was objectively a more ideal juror for the state because: 1) he indicated in his jury questionnaire that he would "always" vote for the death penalty in the case of a rape and murder of a child (during voir dire he stated that he could keep an open mind, but was "leaning toward that"); 2) he only believed a confession would not be a reliable indicator of guilt "if somebody confessed something to protect somebody else"; and 3) believed DNA evidence was "pretty solid" and "reliable." See Appl. pp. 23-24.
In contrast, Phillips apparently indicated that: 1) confessions were not always reliable evidence of guilt and that a person's state of mind and the experience of the interrogators could have an effect; 2) confessions should be evaluated critically if other witnesses' statements conflict with them; 3) some children are "never really given a chance," which can "be the cause of their future actions"; 4) he had a skepticism of law enforcement (though he was later rehabilitated to say that he did not have reservations judging witnesses on their own merits). Appl. pp. 22-23.