Judgment rendered June 23, 2021.
Application for rehearing may be filed
within the delay allowed by Art. 922,
La. C. Cr. P.

No. 53,724-KW
No. 53,725-KW
(Consolidated Cases)

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                          Respondent

versus

BRITTANY TYSON                              Applicant

* * * * *

Appealed from the
Twenty-Sixth Judicial District Court for the
Parish of Webster, Louisiana
Trial Court No. 87847 and 87848

Honorable Michael Owens Craig, Judge

* * * * *

HOGAN ATTORNEYS                             Counsel for Applicant
By: Jane Hogan

JOHN SCHUYLER MARVIN                        Counsel for Respondent
District Attorney

JOHN MICHAEL LAWRENCE
HUGO A. HOLLAND, JR.
Assistant District Attorneys

* * * * *

Before MOORE, PITMAN, and ROBINSON, JJ.

**ROBINSON, J.**

Brittany Tyson pled guilty to manslaughter and was sentenced to 20 years at hard labor for the shaking death of her four-month-old son. She filed an application for post-conviction relief in which she raised claims of actual innocence and ineffective assistance of counsel. The trial court denied her application following an evidentiary hearing ordered by the Louisiana Supreme Court. Tyson then sought supervisory review of the trial court's ruling and this Court granted her writ to docket. For the following reasons, we affirm the trial court's ruling.

## FACTS

Riley Tyson was born to Brittany Tyson ("Tyson") on February 28, 2013. Tyson was 19 years old at the time and a single mother. She had dropped out of school in the ninth grade. On June 16, 2013, Tyson sought medical care for Riley after he sustained second-degree burns to his right leg. The burns were caused when Tyson's 16-year-old sister placed a hair dryer near Riley to soothe him. An investigation by the Department of Children and Family Services ("DCFS") determined that Tyson had failed to provide adequate supervision. The matter was referred to social services. Tyson agreed not to allow her sister to babysit or care for Riley, and Tyson agreed not to use a blow dryer to soothe Riley. No action was requested from the District Attorney.

While the investigation was being conducted, the Webster Parish Sheriff's Office ("WPSO") interviewed Tyson and her sister on June 26, 2013, concerning the burning. Tyson was arrested and charged with second degree cruelty to a juvenile and felony contributing to the delinquency of a juvenile.

On July 19, 2013, Tyson found Riley cold and nonresponsive when she went to check on him in his playpen while staying at her friends' apartment in Sibley, Louisiana. WPSO detectives who responded to the call recognized Riley from the earlier investigation related to the hair dryer incident. Drug paraphernalia containing drug residue was found in the apartment.

Tyson was transported to the WPSO office for an interview by detectives. Tyson told the detectives that she retrieved Riley from the bedroom where he was sleeping earlier that evening because he was crying. She changed his diaper, fed him, gave him gas drops, and rocked him to sleep. After he fell asleep, she returned him to his playpen in the bedroom. Tyson insisted to the detectives that nothing happened as they expressed doubt about her explanation.

Later during the interview, Tyson said that Riley awakened but she was able to get him back to sleep. He woke again screaming shortly thereafter, so she walked around with him while bouncing him. She denied that she bounced Riley too hard. Tyson was then asked if she had shaken Riley that day, and she responded affirmatively. A detective left the interview room and returned with a stuffed animal. Tyson rocked the stuff animal to show how she had handled Riley. When Tyson was asked if she held Riley out with him facing her and said "Why do you cry?", she held the stuffed animal in that manner and asked, "Why do you cry like that?" A detective then told Tyson that when he examined Riley's eyes, the eyes had a "coffee grounds" appearance which comes from being shaken. Tyson explained that she was rocking him but he kept screaming, so she picked him up and shook him. She denied that he stopped crying at that point or

2

when she returned him to his playpen. However, she admitted that he did not cry as loud after she had shaken him. She nodded in the affirmative when asked if she thought she shook him too hard. Later asked to demonstrate how she had shaken Riley, Tyson held the stuffed animal to her face and shook it while saying, "You get on my nerves." She said Riley kept crying after she laid him down in his playpen before returning to the living room. She thought Riley's head rocked forward two to three times when she shook him. She told the detectives that Riley was whimpering after she had shaken him, and his eyes closed. She returned him to his playpen and did not check on him until she discovered him deceased. Tyson was arrested and charged with first degree murder, possession of a Schedule I CDS, and possession of drug paraphernalia.

*Autopsy*

On July 20, 2013, Dr. Frank Peretti performed an autopsy on Riley, who was embalmed following the autopsy. After Dr. Peretti was told by investigators that Riley was shaken prior to being put back in his crib, he performed a posterior neck dissection. The posterior neck dissection revealed acute hemorrhage grossly and microscopically involving the cervical spine at C1. It is unclear from the autopsy report whether other autopsy findings were made during the original autopsy or the posterior neck dissection. Dr. Peretti's findings were healing burns and neck injuries consisting of "[i]njuries involving ligaments of cervical spine at C1" and "[c]erebral edema, mild." Neck injuries were listed as the cause of death.

In the external description section of the autopsy report, Dr. Peretti noted that "[t]the neck was symmetrical, without injury or abnormality." In the subsection for evidence of recent injury, Dr. Peretti wrote:

3

There was no external evidence of injury noted to the head, neck, chest or abdomen. Posterior neck dissection showed hemorrhage surrounding the posterior atlanto-occipital membrane. There was a slight amount of surrounding soft tissue hemorrhage present. The cervical spine at C1 was removed en bloc and was decalcified. The brain grossly showed mild edema.

In the neck subsection of the internal examination section of the autopsy report, Dr. Peretti noted that examination of the soft tissues of the neck revealed no abnormalities or hemorrhage. Dr. Peretti wrote in the central nervous system subsection that there was no epidural, subdural, or subarachnoid hemorrhage present. However, mild cerebral edema was present. Dr. Peretti noted in the musculoskeletal system section that the cervical, thoracic and lumbar spine showed no obvious old fractures or other abnormalities. Regarding the cervical spine at C1, Dr. Peretti wrote in the histology subsection:

After decalcification, step sections were made. There is acute hemorrhage involving the ligaments and soft tissue. Hemosiderin deposits are noted. Iron stains are negative.

*Guilty plea*

M. Randal Fish was appointed to represent Tyson in July of 2013. He filed a motion for discovery and production of documents on July 23, 2013. He also filed a motion for a preliminary hearing. On September 4, 2013, Tyson was indicted for first degree murder in violation of La. R.S. 14:30A(5).

Tyson entered a plea of not guilty on September 9, 2013. Fish filed a motion for appointment of a sanity commission on September 18, 2013. A sanity commission was appointed on September 24, 2013.

Dr. Richard Williams concluded that Tyson was competent. In his report dated October 15, 2013, Dr. Williams wrote:

4

Her version of the accounting was "I put him in a playpen at my friend's house in Sibley." She stated that she was there at her friend's house the entire time, and she said that about an hour to an hour and a-half time elapsed between when she placed her son in the playpen and when she went back to check on him and found him dead. She said that her friend did not go back to check on him with her. She stated that they had watched a movie and had gone outside.

Ms. Tyson stated that she first told the police that she had not shaken her baby, but "when they kept interrogating me, I told them I had so they would stop."

Dr. George Seiden also found Tyson to be competent. In his report dated October 16, 2013, Dr. Seiden wrote:

When asked if she would be willing to provide her version of the events that led to her arrest, Ms. Tyson stated, "He was asleep, so I put him in his playpen, and when I went back to check on him, he was dead." When I then asked her how that would then lead to being charged with first-degree murder, she stated, "When they interviewed me, they asked me if I shook him and I said no." She reported that they continued to repeatedly ask her about shaking her baby, and she stated that she eventually said yes "so they would stop."

On November 13, 2013, the court found Tyson competent to assist in her defense and competent to understand right from wrong at the time of her act. On that same date, Tyson entered a guilty plea to the amended charge of manslaughter. The charges of possession of a Schedule I controlled dangerous substance, possession of drug paraphernalia, second degree cruelty to a juvenile, and contributing to the delinquency of a juvenile were dismissed. On February 14, 2013, Tyson was sentenced to 20 years at hard labor. Tyson did not appeal.

*Post-conviction relief application*

In 2016, Tyson obtained post-conviction representation. Her counsel asked three forensic pathologists to review Dr. Peretti's findings.

5

Dr. L.J. Dragovic is a forensic pathologist and neuropathologist in Oakland County, Michigan. In a letter to counsel dated April 11, 2017, Dr. Dragovic stated that the autopsy performed by Dr. Peretti did not reach the threshold for national standards. He was critical of Dr. Peretti's findings, characterizing them as "an appallingly short list[.]" He believed the finding of neck injuries was highly questionable and unsubstantiated, and the finding of injuries involving ligaments at C1 was at minimum dubious. Dr. Dragovic considered the finding of mild cerebral edema to be false and impossible to substantiate or verify, contradicted by gross description, and unsupported by any photographs.

Dr. Dragovic was also critical that the autopsy report listed neck injuries as a cause of death but failed to address the manner of death. Further, he believed Dr. Peretti's description of the central nervous system contradicted Dr. Peretti's opinion on the matter. Moreover, he considered Dr. Peretti's finding in the cervical spine at C1 of hemosiderin deposits while iron stains were negative to be nonsensical because the two findings are mutually exclusive.

Dr. Dragovic concluded there was no tangible physical evidence that Riley had been purposely subjected to any form of violence that could have resulted in his death. In his opinion, Riley likely died of asphyxia resulting from overlay.

Dr. John Plunkett also examined this matter on behalf of Tyson. In a letter to counsel dated May 3, 2017, he noted that Dr. Peretti was not a board-certified pathologist. He added that he did not know what Dr. Peretti's cause-of-death conclusion was following the first autopsy.

6

Dr. Plunkett disagreed with Dr. Peretti's conclusion regarding the cause and manner of Riley's death. In Dr. Plunkett's opinion, Dr. Peretti observed and described an artifact from the embalming process. Moreover, true and significant neck injuries involve damage to the connective tissue, bone, and spinal cord. None of that existed in this case, as Riley presented no evidence of mechanical or structural damage to his neck.

Dr. Plunkett believed that the autopsy failed to meet the minimum forensic autopsy performance standards at the time it was conducted. The report did not indicate the date and time that the second autopsy was conducted. Dr. Peretti did not describe the damage done during the embalming process, and he failed to sign and date the initial autopsy report. Dr. Plunkett questioned Dr. Peretti's finding of hemosiderin deposits but a negative iron stain during the microscopic examination of the cervical spine. He believed that what Dr. Peretti was describing was actually formalin pigment secondary to the embalming process and not hemosiderin.

It was Dr. Plunkett's opinion that the cause of Riley's death is undetermined. While he acknowledged that some forensic pathologists would use the terms SIDS to describe Riley's death, he does not use that term. Dr. Plunkett added that he would not disagree with a pathologist who reached the conclusion that an unsafe sleeping environment caused or contributed to Riley's death. Dr. Plunkett believed there was no evidence that shaking caused or contributed to Riley's death.

Dr. Harry Bonnell is a forensic pathologist who had been the Chief Deputy Coroner and Director of Forensic Pathology of Hamilton County, Ohio. In his affidavit from October 23, 2017, Dr. Bonnell testified: (i) Dr. Peretti was not a board-certified forensic pathologist; (ii) the autopsy report

7

did not describe any injuries which could be lethal; (iii) the hemorrhage described in the neck dissection had the same appearance as that caused by lividity; (iv) it was scientifically impossible for there to be no hemosiderin yet have positive iron stains in the same area as described in the autopsy;[1] (v) what Dr. Peretti described as hemosiderin was actually formalin artifact from the embalming process; (vi) it is possible Riley died from smothering or overlaying while in the blanket but the investigation was insufficient to establish that to be any more than a remote possibility; (vii) Dr. Peretti would not have felt obligated to autopsy the neck area during the second examination if he had not been influenced by the coerced confession; (viii) Dr. Peretti was unfamiliar with the neck area since he did not autopsy that area as part of his routine autopsy technique; and (ix) had an adequate autopsy and investigation been performed, Riley's death would fit the criteria of having an undetermined cause of death, which is commonly defined as SIDS.

On January 10, 2018, Tyson's counsel filed an application for post-conviction relief in which she raised claims of actual innocence and ineffective assistance of counsel. She alleged that her application was filed timely based on newly discovered evidence, that being Dr. Peretti's complete file, which retained counsel had obtained in November of 2016.

In support of her non-DNA based actual innocence claim, Tyson argued that there is overwhelming evidence that she is factually innocent and did not kill her son. Tyson noted that Dr. Dragovic, Dr. Bonnell, and Dr. Plunkett performed independent evaluations of Dr. Peretti's autopsy findings

---

[1] Dr. Peretti actually found the opposite.

and concluded that there was no evidence that Riley died as a result of shaking or neck injuries. The pathologists also concluded that the cause of death was undetermined, although it was possible that Riley died from suffocation due to an unsafe sleeping environment.

Tyson also complained that three hours after she discovered that Riley was dead, she was subjected to a highly stressful and accusatory interrogation, during which the detectives used a false evidence ploy (evidence of retinal hemorrhaging which suggested shaking) to coerce a false confession from her. Tyson asserted that her innocence was further corroborated by statements from her friends Megan Lewis and Lauren Lewis, who were with Tyson on the day of Riley's death and stated that they never saw Tyson shake or be aggressive toward Riley.

In support of her claim of ineffective assistance of counsel, Tyson argued that Fish failed to conduct an independent pretrial investigation, failed to interview Lauren and Megan Lewis, failed to scrutinize the autopsy report, and failed to seek a second opinion as to the cause of Riley's death. Tyson contended that although she maintained her innocence and informed Fish that she told the police that she shook Riley in an effort to cease the investigation, Fish never investigated her claims and advised her to plead guilty. Moreover, Fish filed only three stock motions on her behalf and did not seek funding for an expert pathologist to scrutinize Dr. Peretti's autopsy findings. Tyson claimed that with minimal effort, this case would have concluded without a conviction because she is factually innocent.

On March 27, 2018, the trial court denied the PCR application as untimely. Tyson applied for a supervisory writ with this Court, which was

9

denied on August 2, 2018.  The order from this Court stated, "On the showing made, the writ is denied.  La. C. Cr. P. art. 930.2."

On April 22, 2019, the Louisiana Supreme Court granted Tyson's writ.  The *per curiam* granting the writ stated:

> The district court's ruling dismissing petitioner's actual innocence and ineffective assistance of counsel claims is reversed, and the claims are remanded for consideration after an evidentiary hearing.  *See* La. C. Cr. P. art. 930.8(A)(1); *see also State v. Pierre*, 13-0873, p. 4 (La. 10/15/13), 125 So. 3d 403, 409 (new evidence of actual innocence must be so compelling that no reasonable juror could have voted to convict with knowledge thereof); *State v. Conway*, 01-2808, p. 1 (La. 4/12/02), 816 So. 2d 290, 291 (assuming post-conviction claims of actual innocence not based on DNA evidence are cognizable, they must be supported by new, material, noncumulative and conclusive evidence which meets an extraordinarily high standard, and which undermines the prosecution's entire case).

*State v. Tyson*, 18-1475 (La. 4/22/19), 267 So. 3d 584.  Justice Crichton disagreed and wrote that he would deny the writ as untimely and alternatively on the merits.

### Post-conviction relief hearing

An evidentiary hearing was held on November 25, 2019.  The trial court heard testimony from Dr. Dragovic, Fish, and Tyson's mother.  Introduced into evidence at the hearing were: (i) the DCFS report from the burning incident; (ii) the competency findings of Drs. Seiden and Williams; (iii) the autopsy report; (iv) Riley's medical records; (v) Dr. Dragovic's letter to Tyson's counsel and his *curriculum vitae* ("CV"); (vi) the report and supplemental report from the WPSO concerning the investigation into Riley's death; (vii) Dr. Bonnell's affidavit and CV; (viii) Dr. Plunkett's letter to Tyson's counsel; (ix) handwritten statements from two of Tyson's

10

friends[2]; (x) a transcript of Tyson's interview prepared by her counsel; (xi) a news article from a local newspaper concerning Riley's death; and (xii) DVDs of Tyson's interview by the WPSO detectives as well as the detectives' interviews of three of her friends who were present in the apartment on the date of Riley's death.

Dr. Dragovic testified as an expert in the field of forensic pathology. He noted that Dr. Peretti was not a board-certified forensic pathologist. Dr. Dragovic explained that embalming can interfere with some of the aspects of a medical investigation. However, performing the posterior neck dissection after Riley was embalmed was not a problem. The problem was that Riley's cervical spinal cord was found to be intact as well as there being no fracture at C1. Dr. Dragovic stated that in order to cause death, an injury at C1 would have to involve the cervical spinal cord being compromised by the movement of the bony structures. Dr. Dragovic found no indications that Riley suffered from any violent contact.

Dr. Dragovic testified that there was no scientific physical evidence that supported Tyson's statement that she held Riley out and his head rocked back and forth two to three times. There would have been evidence of brain trauma if it had occurred as described by Tyson. However, there was no evidence of brain herniation, bruising, or hemorrhage. Dr. Dragovic regarded the finding of mild cerebral swelling as meaningless. Moreover, nothing in the autopsy, slides, or photographs corroborated Dr. Peretti's

---

[2] Lauren Lewis wrote that she never saw Tyson be aggressive toward Riley. Megan Lewis wrote that she was with Tyson most of the day and never saw Tyson shake Riley or be aggressive toward him.

finding of mild edema. In his opinion, there was no brain injury that contributed to Riley's death.

Dr. Dragovic explained that he did not see hemorrhage involving ligaments and soft tissue at C1 when he reviewed the slides and photographs from Dr. Peretti's examination. There was some settling of blood in the area from the body's position after death. When examining the cervical spine at C1, Dr. Peretti had noted hemosiderin deposits, but iron stains were negative. According to Dr. Dragovic, hemosiderin is a pigment from the blood cells that contains iron. Thus, a negative iron stain in the presence of hemosiderin would not make any sense. Moreover, the presence of hemosiderin indicates an older hemorrhage of at least three days.

Dr. Dragovic was dismissive of the claim made by a detective to Tyson that he could see signs that Riley had been shaken when he looked at Riley's eyes. While Dr. Dragovic acknowledged there is the potential for retinal hemorrhage when there is significant head trauma, this hemorrhage could not be seen without using an ophthalmologic instrument.

Dr. Dragovic did not find any scientific evidence substantiating Dr. Peretti's claim that Riley's death was caused by neck injuries. In his opinion, Riley's death was most likely caused by asphyxia resulting from sleeping in the playpen with a large blanket. Asphyxia in small babies normally does not reveal signs of injury. Dr. Dragovic concluded that Riley was not the victim of intentional violence or child abuse.

Randal Fish testified he is the full-time public defender in Bossier and Webster Parishes. He has been practicing criminal defense since 1980. He was provided with a paralegal and had an investigator and a secretary. He handled capital or life without parole cases. He has about 14-15 open cases

12

at any time, but only one or two of those cases were capital cases in July of 2013. Fish also had a very limited private criminal practice.

Fish met with Tyson three or four times. She was detained throughout this proceeding. He recalled that he met with Tyson's family once in his office and possibly more than once at the courthouse. He spent four to five hours reviewing the discovery in this case including the recording of Tyson's statement to investigators, the autopsy report, and the statements of her three friends present in the apartment. Fish believed that he spoke with the three friends or their attorneys at the courthouse. He did not recall failing to follow up on any information or leads that Tyson may have given to him.

Fish acknowledged that he never sought a second opinion on Dr. Peretti's conclusion regarding the cause of Riley's death. He added that since Tyson's guilty plea, he has represented other defendants in shaken baby cases and as he has learned about them, he has developed better resources generally. He testified that he will at least seek an initial review of the autopsy report in most shaken baby cases. This review is funded through the public defender's office. Fish testified that in hindsight, he would probably seek a second opinion if Tyson's case came through his office now by sending the autopsy materials for review by a doctor that he knows in San Antonio, Texas.

While Fish saw nothing in Dr. Peretti's report that made him think he needed to contact Dr. Peretti and question him about what was in the report, it would cause Fish concern if Dr. Peretti had rendered a cause of death after the autopsy and then changed the cause of death after speaking to law enforcement. It would also concern him if Dr. Peretti did not have any

13

conclusions after the initial autopsy, but after the detectives contacted him to say that Tyson confessed, he conducted further examination and found that evidence.

Fish did not recall noticing that Dr. Peretti had performed the neck dissection after speaking with the detectives from the WPSO and only then rendered neck injuries as the cause of death. He acknowledged that it would have set off a red flag had he noticed that at the time.

Fish explained that he requested a sanity commission because he was concerned that Tyson had a mental disability because she had left school in the ninth grade. He reviewed the reports from Dr. Seiden and Dr. Williams before she pled guilty. He noticed that she maintained her innocence in both reports, but he did not specifically recall if Tyson maintained her innocence when he spoke to her, only that there were discussions about whether she meant to harm Riley.

Fish's philosophy is that he does not need to file every defense motion at his disposal, and in his opinion there was no additional motion that he should have filed in this matter. Regarding Tyson's statement to investigators, he did not think a motion to suppress would have been the proper vehicle to counter it even though he had some reservations about the questions asked and the methods used by the detectives. He regarded any issues surrounding her confession to center on the weight accorded to the confession.

Fish testified that the plea agreement was offered by the District Attorney around October 26, 2013, and the offer would be withdrawn if not accepted. He did not remember exactly when he discussed the plea with

Tyson. Despite the request for a sanity commission, he did not have any concerns about whether Tyson understood the plea offer.

It was Fish's professional opinion at the time that the plea was in her best interest and he communicated that to Tyson and her parents. The reason that he thought it was in her best interest was because if the State withdrew the plea offer and tried her for second or first degree murder, he thought the chances were very high that she would be convicted and spend the rest of her life in prison. He felt that way in light of Dr. Peretti's opinion, Tyson's problematic admission to shaking Riley, and the recent burn incident. It was his impression that Dr. Peretti communicated well when testifying. Fish acknowledged that his advice to take the plea was largely premised on Dr. Peretti's autopsy report and conclusion that Riley died from neck injuries.

While Fish agreed in hindsight that it would have been better to have obtained a second opinion regarding the cause of death, he did not know if a second opinion would have appreciably changed his advice, but it could have. Nevertheless, he did not favor the idea of going to trial with someone's life on the line and depending on dueling experts, particularly when there was a confession.

Tyson pled guilty without there being a sentencing cap. Fish's understanding was that the State would not take a position on sentencing. Fish testified that he had a conversation with the trial judge prior to the plea being entered concerning the facts in general and what the judge's feelings toward the sentencing would be. Tyson was sentenced to what Fish and the trial judge had discussed. The trial judge did what he indicated he would do in their conversations.

Belinda Couch is Tyson's mother. She testified that she met with Fish once in his office and then in court before sentencing. She disputed Fish's account that he expected a sentence of 20 years if her daughter pled guilty. She recalled that Fish told them it was in her daughter's best interest to plead guilty to negligent homicide and that her sentence would be 5-10 years. Tyson's potential sentence was discussed on the day that she pled guilty. Couch testified that she told Fish that local media was reporting that Riley had died from suffocation.

In a post-hearing memorandum, Tyson argued that Dr. Peretti's autopsy report was internally inconsistent and contained unsupported conclusions. She further argued that Dr. Dragovic's testimony discredited Dr. Peretti's findings and proved that Riley did not die from neck injuries. She emphasized Dr. Dragovic's conclusions that there was no evidence of injury to Riley's neck, no evidence of mild cerebral edema, and no proof that Riley died from intentional violence, and that the likely cause of death was unintentional asphyxiation. Tyson argued that Dr. Dragovic's testimony, which was corroborated by Dr. Bonnell and Dr. Plunkett, met the extraordinarily high standard for non-DNA based claims of actual innocence because it undermined the State's entire case and was so compelling that a reasonable juror could not have voted to convict. Further, Tyson claimed that because Dr. Dragovic concluded that Riley could not have died in the manner described in her statement to police, her statement was not corroborated, and standing alone, was insufficient to sustain her conviction.

Regarding her ineffective assistance of counsel claim, Tyson argued that Fish failed to conduct an adequate pretrial investigation, failed to consult an expert about the cause of Riley's death, and failed to subject the

16

State's case to any meaningful adversarial review. Tyson asserted that given the severity of the first degree murder charge and potential life sentence, Fish's investigation was shockingly scant and limited to a cursory review of the discovery provided by the State. Tyson also noted that Fish's testimony showed that he was engaged in plea negotiations while the issue of her competency to stand trial was pending.

### Ruling

The trial court denied Tyson's post-conviction relief claim of actual innocence because she failed to prove that the expert opinion testimony of Dr. Dragovic was evidence of actual innocence so compelling that no reasonable juror could vote to convict. The trial court also denied Tyson's post-conviction relief claim of ineffective assistance of counsel because she failed to prove that Fish was ineffective in his representation or that he failed to provide the minimum standards required by the constitutions of Louisiana and the United States.

The trial court noted that Tyson's claim of actual innocence rested solely on medical opinion testimony from Dr. Dragovic's review of Dr. Peretti's autopsy report several years later. The court also noted that Dr. Dragovic and Dr. Peretti are board-certified forensic pathologists and qualified as experts in autopsy and determining cause of death. The court reasoned that after listening to the opinions of Dr. Dragovic and Dr. Peretti, a reasonable juror could have believed one expert's opinion over the other. In essence, it would have been a case of dueling experts.

Moreover, a jury could have found Dr. Peretti was in a better position to determine Riley's cause of death since he performed the autopsy immediately after the death, while Dr. Dragovic reviewed the autopsy report

17

several years later. Therefore, Dr. Dragovic's expert opinion testimony did not rise to the level of being new, material, noncumulative, and conclusive evidence that was so compelling that it undermined the State's entire case to the point that no reasonable juror would have voted to convict.

The trial court also found that Tyson failed to prove that Fish was ineffective in his representation or that he failed to provide the minimum standards required by the United States and Louisiana Constitutions. Additionally, she failed to prove that his representation was so ineffective that it required reversal. The court noted that Fish was a seasoned criminal trial attorney who had handled a large number of serious felony cases, including capital cases. The court also noted that under the circumstances, his advice to Tyson would be the same even if he had been provided with Dr. Dragovic's contrary opinion from the beginning. The court acknowledged that Tyson had shown that additional steps could have been taken on her behalf and that she might have prevailed at trial by presenting a contrary expert opinion. However, that was far from the threshold of compelling proof that an acquittal was a certainty. Fish's experience and recommendation to accept the plea offer could have just as easily saved Tyson from a life sentence.

Tyson applied to this Court for supervisory review. Her writ was granted to docket.

## DISCUSSION

Tyson argues in her first assignment of error that the trial court erred in its analysis of her actual innocence claim because the defense presented uncontroverted medical testimony that Riley did not die from intentional violence. This testimony was corroborated by additional expert reports and

by evidence collected at the time of the offense, including witness statements that Tyson did not abuse Riley on the day of his death.

Tyson argues in her second assignment of error that the trial court erred when it found that trial counsel provided effective representation because counsel admittedly did not conduct any independent investigation, did not seek a second medical opinion, and limited his representation to reviewing the state's discovery and advising Tyson to plead guilty.

### Actual innocence

Tyson contends that based on Dr. Dragovic's unrefuted testimony that Riley did not die from neck injuries or intentional violence, she is serving a prison sentence for a crime that she did not commit. She argues that the trial court discounted the extensive evidence in support of Tyson's actual innocence. Not only is Dr. Dragovic's testimony corroborated by two other experts, but it is also consistent with the statements of the eyewitnesses who spent the day with Tyson and did not witness abuse as well as consistent with Tyson's own statements to the psychiatrists that she did not abuse Riley. Tyson maintains that this evidence undermines the State's entire case against her and proves that the findings in Dr. Peretti's report were unsupported and internally inconsistent, such that no reasonable juror armed with this knowledge could have voted to convict her of second degree murder.

The State counters that the trial court properly denied Tyson's application for post-conviction relief. The State adopted the reasons set forth in the trial court's ruling and noted that the court provided a thorough analysis of the evidence and testimony presented. The State argues that Tyson pled guilty to the reduced charge of manslaughter, thereby waiving all

non-jurisdictional defects, and that Tyson failed to meet the extraordinarily high burden of establishing a non-DNA actual innocence claim.

The petitioner in an application for post-conviction relief bears the burden of proving that he is entitled to relief. La. C. Cr. P. art. 930.2. An application for post-conviction relief must state with "reasonable particularity" the factual basis for the relief sought. La. C. Cr. P. art. 926(B)(3).

Generally, a valid, unqualified plea of guilty waives the defendant's right to appeal all non-jurisdictional defects in the proceedings prior to the plea. *State v. Crosby*, 338 So. 2d 584 (La. 1976); *State v. Burks*, 47,587 (La. App. 2 Cir. 1/16/13), 108 So. 3d 820, *writ denied*, 13-0424 (La. 7/31/13), 118 So. 3d 1116. The defendant's guilty plea also waives any right to question the merits of the state's case and factual basis for the plea. *State v. Shaw*, 49,876 (La. App. 2 Cir. 5/20/15), 166 So. 3d 1185, *writ denied*, 15-1247 (La. 6/3/16), 192 So. 3d 755.

La. C. Cr. P. art. 930.3, which sets forth the exclusive grounds for post-conviction relief, does not include the ground of actual innocence not based on DNA evidence. The Louisiana Supreme Court has not expressly held that a claim of actual innocence, not based on DNA, is cognizable on post-conviction relief. However, in *State v. Conway*, 01-2808 (La. 4/12/02), 816 So. 2d 290, the supreme court explained that, assuming that such a claim is cognizable, the claim must involve new, material, noncumulative and conclusive evidence which meets an extraordinarily high standard, and which undermines the prosecution's entire case.

In *State v. Pierre*, 13-0873 (La. 10/15/13), 125 So. 3d 403, the supreme court contemplated the level of proof necessary for a free-standing

20

claim of factual innocence not based on DNA evidence. While the supreme court did not fully define the burden of proof for factual innocence, it stated that a petitioner must persuade the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.[3] Further, a credible claim requires new reliable evidence, whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence, that was not presented at trial.

The supreme court also stated in *Pierre* that "[a]ctual innocence also referred to as factual innocence is different than legal innocence. Actual innocence is not demonstrated merely by showing that there was insufficient evidence to prove guilt beyond a reasonable doubt." *Id*., 13-0873 at p. 9, 125 So. 3d at 409.[4]

Although no Louisiana state court has addressed the issue of whether a defendant who pled guilty to an offense may be allowed to raise a claim of actual innocence not based on DNA evidence, other courts are split on the issue. *See e.g. Schmidt v. State*, 909 N.W. 2d 778, 789 (Iowa 2018) (finding that "convicted defendants can attack their pleas when claiming actual innocence even if the attack is extrinsic to the pleas"); *People v. Tiger*, 32 N.Y. 3d 91, 101, 110 N.E. 3d 509, 85 N.Y.S. 3d 397 (2018) ("Allowing a collateral attack on a guilty plea obtained in a judicial proceeding that comported with all of the requisite constitutional protections on the basis of a delayed claim of actual innocence would be inconsistent with our

---

[3] Citing *McQuiggin v. Perkins*, 569 U.S. 383, 133 S. Ct. 1924, 185 L. Ed. 2d 1019 (2013).

[4] Citing *Gould v. Commissioner of Correction*, 301 Conn. 544, 22 A.3d 1196, 1206 (2011).

jurisprudence and would effectively defeat the finality that attends a constitutionally obtained guilty plea.").

By entering an unqualified guilty plea, Tyson admitted her guilt and waived the right to challenge the sufficiency of the evidence against her. However, assuming that non-DNA based actual innocence claims are cognizable on post-conviction relief in Louisiana, and that such a claim may be raised by a defendant who pled guilty, Tyson fails to meet the extraordinarily high standard required by *State v. Conway*, *supra*, and *State v. Pierre*, *supra*. Specifically, Tyson's application does not present any new, material, noncumulative, and conclusive evidence that completely undermines the State's entire case and is so compelling that no reasonable juror would have found her guilty. Dr. Dragovic's testimony and the reports of Dr. Bonnell and Dr. Plunkett call into question the possible cause of Riley's death and attempt to undermine Dr. Peretti's autopsy findings. Although this new evidence is troubling and raises doubt as to whether Tyson shook Riley, it does not rise to the level of conclusive evidence of Tyson's innocence.

Had Dr. Dragovic's opinions been introduced at trial, the jury would have been presented with dueling expert opinions and a reasonable juror could still convict Tyson. Because Dr. Dragovic, Dr. Bonnell, and Dr. Plunkett never examined or performed any autopsy procedures on Riley's body, a jury could rationally choose to accept the testimony of Dr. Peretti about the cause of Riley's death and reject the testimony of Tyson's experts. Further, even if this new evidence persuaded the jury that Riley died from asphyxiation, not neck injuries caused by shaking, the jury could have still found that Tyson was criminally negligent in putting Riley in the bed face

down with a large blanket.  Tyson failed to meet her burden of proving that she is factually innocent.  Her argument on this issue is without merit.

*Ineffective assistance of counsel*

Tyson contends that the evidence established that Fish did not conduct an independent pretrial investigation, failed to seek a second opinion on cause of death, and engaged in plea negotiations prior to a judicial ruling on her competency to stand trial.  Tyson claims Fish advised her to plead guilty, despite questioning her legal competency, based on a cursory review of the State's discovery and without any investigation into the obvious issues contained in the autopsy report.

Tyson also argues that the trial court applied an incorrect legal standard in denying her claim of ineffective assistance of counsel because she was only required to prove the reasonable probability of a different result, not that "acquittal was a certainty."  Tyson maintains that if Fish had adequately investigated her case and obtained a second opinion regarding the cause of her son's death, there is a reasonable probability that the result of this case would have been different.  Further, because Fish failed to subject the prosecution's case to any meaningful adversarial testing, Tyson argues that prejudice should be presumed.

Adopting the reasons set forth in the trial court's ruling, the State counters that the trial court properly denied Tyson's application.  The State argues Fish's performance did not fall below an objective standard of reasonableness and that Tyson failed to establish that the new medical theory of Dr. Dragovic, if presented to a jury, would result in an acquittal.

A claim of ineffective assistance of counsel is analyzed under the two-prong test developed in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct.

23

2052, 80 L. Ed. 2d 674 (1984). First, to establish that her attorney was ineffective, the defendant must show that counsel's performance was deficient. This requires a showing that counsel made errors so serious that he was not functioning as the counsel guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that counsel's deficient performance prejudiced his defense and that, but for counsel's unprofessional errors, there is a reasonable probability the outcome of the trial would have been different. *Strickland v Washington*, *supra*; *State v. Reese*, 49,849 (La. App. 2 Cir. 5/20/15), 166 So. 3d 1175, *writ denied*, 15-1236 (La. 6/3/16), 192 So. 3d 760. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Strickland v. Washington*, *supra*. *See also State v. Curley*, 16-1708 (La. 6/27/18), 250 So. 3d 236, where the court noted that *Strickland* only requires the reasonable probability of a different result, not the reasonable probability of an acquittal.

In *U.S. v. Cronic*, 466 U.S. 648, 104 S. Ct. 2039, 80 L. Ed. 2d 657 (1984), the Supreme Court created limited exceptions to the application of *Strickland*'s two-part test in situations that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified. The Supreme Court identified three situations implicating the right to counsel in which prejudice must be presumed: (1) where a defendant is denied counsel at a critical stage of the proceedings; (2) when counsel "entirely fails to subject the prosecution's case to meaningful adversarial testing;" and (3) when the circumstances surrounding a trial prevent the defendant's attorney from rendering effective assistance of counsel. *Id.*, 104 S. Ct. at 2047, 80 L. Ed. 2d at 659-60.

24

Regarding the second exception, the Supreme Court reiterated in *Bell v. Cone*, 535 U.S. 685, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002), that the attorney's failure must be complete. In *Craker v. McCotter*, 805 F.2d 538 (5th Cir. 1986), the appellate court recognized that a constructive denial of counsel occurs in only a very narrow spectrum of cases where the circumstances leading to counsel's ineffectiveness are so egregious that the defendant was effectively denied any meaningful assistance at all. In *Goodwin v. Johnson*, 132 F.3d 162 (5th Cir. 1997), the appellate court stated that when the defendant receives at least some meaningful assistance, he must prove prejudice in order to obtain relief for ineffective assistance of counsel.[5] In *Woodard v. Collins*, 898 F.2d 1027, 1029 (5th Cir. 1990), the appellate court declared that "a decision to investigate some issues and not others or even a decision to conduct virtually no investigation is governed by *Strickland* and its progeny." Thus, a showing of actual prejudice was required.

In *Johnson v. Cockrell*, 301 F.3d 234 (5th Cir. 2002), the appellate court explained that for purposes of distinguishing between the rule of *Strickland* and that of *Cronic*, a case does not come under *Cronic* merely because counsel failed to oppose the prosecution at specific points in the trial, nor is it enough for defendant to show mere shoddy representation or to prove the existence of errors, omissions, or strategic blunders by counsel. The *Cockrell* court further noted that bad lawyering, regardless of how bad, does not support the *per se* presumption of prejudice.

---

[5] Citing *Childress v. Johnson*, 103 F.3d 1221 (5th Cir. 1997).

A defendant who pleads guilty and then claims he received ineffective assistance of counsel must first show that counsel's advice to plead guilty was not within the wide range of competence demanded of attorneys in criminal cases. The defendant must also show that, but for counsel's erroneous advice, he would have elected to go to trial rather than plead guilty. *State v. Meadows*, 51,843 (La. App. 2 Cir. 1/10/18), 246 So. 3d 639, *writ denied*, 18-0259 (La. 10/29/18), 254 So. 3d 1208. *See also Lee v. U.S.*, __ U.S. __, 137 S. Ct. 1958, 1967, 198 L. Ed. 2d 476 (2017), where the Supreme Court stated that "[c]ourts should not upset a plea solely because of *post hoc* assertions from a defendant about how he would have pleaded but for his attorney's deficiencies . . . [but] instead look to contemporaneous evidence to substantiate a defendant's expressed preferences."

In *Hill v. Lockhart*, 474 U.S. 52, 106 S. Ct. 366, 88 L. Ed. 2d 203 (1985), the Supreme Court explained:

> In many guilty plea cases, the "prejudice" inquiry will closely resemble the inquiry engaged in by courts reviewing ineffective-assistance challenges to convictions obtained through a trial. For example, where the alleged error of counsel is a failure to investigate or discover potentially exculpatory evidence, the determination whether the error "prejudiced" the defendant by causing him to plead guilty rather than go to trial will depend on the likelihood that discovery of the evidence would have led counsel to change his recommendation as to the plea. This assessment, in turn, will depend in large part on a prediction whether the evidence likely would have changed the outcome of a trial.

*Id.*, 474 U.S. at 59, 106 S. Ct. at 370.

A reviewing court must give great deference to trial counsel's judgment, tactical decisions, and trial strategy, strongly presuming he has exercised reasonable professional judgment. *State v. Smith*, 49,356 (La. App. 2 Cir. 11/19/14), 152 So. 3d 218, *writ denied*, 14-2695 (La. 10/23/15),

179 So. 3d 597.  A defendant making a claim of ineffective assistance of counsel must identify certain acts or omissions by counsel which led to the claim; general statements and conclusory charges will not suffice. *Strickland v. Washington*, *supra*; *State v. Critton*, 52,058 (La. App. 2 Cir. 8/22/18), 251 So. 3d 1281, *writ denied*, 18-1515 (La. 2/25/19), 266 So. 3d 292.

Whether to call a witness is within the ambit of trial strategy.  *State v. Reeves*, 18-0270 (La. 10/15/18), 254 So. 3d 665.  Additionally, the securing of an expert witness is a strategic and tactical decision made by defendant's trial counsel.  *State v. Prater*, 15-0079 (La. App. 1 Cir. 11/6/15), 2015 WL 6835423 (unpublished), *writ denied*, 15-2234 (La. 4/22/16), 191 So. 3d 1046.  Regarding the failure to call an expert witness, the court stated in *State v. Reeves*, 18-0270 at pp. 5-6, 254 So. 3d at 671-72:

> Additionally, though Reeves faults Ware for failing to call a counter-expert,  he fails to demonstrate that funding was (or could have been made) available or the nature of that proposed expert's testimony. *See* La. C. Cr. P. art. 930.2; *see also Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009) ("[T]o prevail on an ineffective assistance claim based on counsel's failure to call a witness, the petitioner must name the witness, demonstrate that the witness was available to testify and would have done so, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable to a particular defense.

In *Strickland v. Washington*, 104 S. Ct. at 2066, 80 L. Ed. 2d at 690-91, the Supreme Court stated:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.  In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.  In any ineffectiveness case, a particular decision not to investigate

27

must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

Counsel has a duty to make a reasonable investigation, and a decision not to investigate must be assessed for reasonableness under the circumstances. *Strickland v. Washington*, *supra*; *State v. Joshua*, 50,566 (La. App. 2 Cir. 8/10/16), 201 So. 3d 284. Counsel's investigative actions and choices may be influenced by information and decisions from the defendant and, under the circumstances of the case, might diminish or eliminate the need for further investigation. *Id.*

In *Gray v. Lucas*, 677 F.2d 1086, 1093 (5th Cir. 1982), the U.S. Fifth Circuit discussed a claim of inadequate investigation:

> We have previously recognized that adequate investigation is a requisite of effective assistance. . . . When, as in this case, a defendant alleges that his counsel's failure to investigate prevented his counsel from making an informed tactical choice, he must show that knowledge of the uninvestigated evidence would have altered his counsel's decision. The fact that an investigation would have turned up admissible evidence is in itself insufficient to show prejudice. *Cf. Washington v. Strickland*, 673 F. 2d 879 (5th Cir. 1982). A defendant must demonstrate that the bases underlying his counsel's tactical choice to pursue or forego a particular course would have been invalidated.

Tyson argues that Fish was ineffective in failing to conduct an independent pretrial investigation and failing to seek a second opinion on cause of death. Fish's investigation of this case was limited to a four or five hour review of the discovery provided by the state. Despite the fact that funding was available, Fish did not seek a second opinion on the alleged cause of death or even talk to a pathology expert to review Dr. Peretti's autopsy findings. The findings in the autopsy report, including the fact that some findings were made after discussions with law enforcement, should

28

have alerted Fish to the need for further investigation. Nevertheless, early in his representation, the State presented Fish with the offer for Tyson to plead guilty to a lesser offense without a recommended sentence. Fish also discussed the possible sentence with the trial judge. Under the circumstances, and considering the sentence Tyson faced if convicted, the representation by Fish, an experienced criminal defense lawyer, was not deficient in this matter. However, even if we assume that Fish's representation was deficient and fell below the objective standard of reasonableness, we cannot conclude that Tyson was prejudiced.

Regarding the prejudice prong of *Strickland*, Tyson correctly asserts that the trial court applied the wrong standard in denying her claim. The trial court found that Tyson failed to show that "acquittal was a certainty." The correct standard is whether there is a reasonable probability the outcome of the trial would have been different. However, because Tyson pled guilty, she is required to prove that but for counsel's erroneous advice, she would have elected to go to trial rather than plead guilty. On review, Tyson merely claims that there is a reasonable probability that the result of this case would have been different if Fish had adequately investigated and sought a second opinion on cause of death, and ultimately relies on the presumption of prejudice set forth in *United States v. Cronic*, *supra*. In order for the presumption to apply, Tyson must establish that Fish entirely failed to subject the prosecution's case to meaningful adversarial testing such that she was denied any meaningful assistance. Because Fish reviewed discovery, filed several motions, and negotiated and provided Tyson with advice regarding the guilty plea, Fish provided Tyson with some meaningful assistance and this case does not fall within the narrow spectrum of cases

29

described in *Cronic*, *supra*. Therefore, because Tyson has failed to establish that she is entitled to receive the benefit of the *Cronic* presumption, she is required to establish actual prejudice.

As noted above, to prove prejudice, Tyson was required to establish that there is a reasonable probability that Fish's errors affected the outcome of the plea process such that she would have rejected the plea and insisted on going to trial. This determination is based on the likelihood that discovery of the new evidence would have led counsel to change his recommendation as to the plea, which depends on whether the evidence likely would have changed the outcome of a trial. Fish advised Tyson that it was in her best interest to plead guilty to manslaughter to avoid a potential life sentence based on the strength of the State's case. Fish's recommendation was based on Dr. Peretti's conclusion that Riley died from neck injuries, Tyson's confession, and the prior DCFS case regarding injuries to Riley. Although Dr. Dragovic's testimony casts doubt on Dr. Peretti's autopsy findings and the truth of Tyson's confession, Fish testified that he would still recommend that Tyson accept the plea, considering the risk of going to trial while relying on the opinions of dueling experts. Because the new evidence would not have changed Fish's recommendation and there is no evidence that Tyson would have rejected Fish's advice in light of this evidence, Tyson failed to establish any prejudice as a result of Fish's failure to conduct a more thorough investigation.

As to Tyson's claim that Fish was ineffective in engaging in plea negotiations prior to a judicial ruling on her competency to stand trial, this claim is without merit. Although counsel may have negotiated the plea agreement before the trial court determined that Tyson was competent, the

30

sanity reports were issued approximately one month before Tyson pled guilty, the plea was offered after the reports were issued, and Fish reviewed those reports before the date of the competency/guilty plea hearing.

## CONCLUSION

For the foregoing reasons, the trial court's ruling denying Tyson's post-conviction relief claims of absolute innocence and ineffective assistance of counsel is affirmed.

**AFFIRMED.**